IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
───────────────────────────────

UNITED STATES OF AMERICA,

       v.                                      07-CR-304-S

CARL A. LARSON, *et al.*,

            Defendants.

───────────────────────────────

## GOVERNMENT'S RESPONSE TO THE DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT

**THE UNITED STATES OF AMERICA**, by and through its attorney, William J. Hochul, Jr., United States Attorney for the Western District of New York, Charles B. Wydysh, Anthony M. Bruce, Assistant United States Attorneys, of counsel, and Audrey Herman, Law Clerk, of counsel, hereby files its response to the defendants' motion to dismiss the Superseding Indictment on the grounds that a prosecution is precluded by the holding of <u>United States v. Enmons</u>, 410 U.S. 396 (1973); that the Superseding Indictment is generic and vague; that the Superseding Indictment is facially insufficient; that it fails to contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged"; that the Superseding Indictment is unconstitutional "as applied"; and that it violates the due process clause of the United States Constitution.

# I. <u>STATEMENT OF RELEVANT FACTS</u>

On April 1, 2008, the grand jury returned a Superseding Indictment charging the various defendants with Racketeering Conspiracy, in violation of 18 U.S.C. § 1962(d) (Count 1); Hobbs Act Conspiracy, in violation of 18 U.S.C. § 1951 (Count 2); Attempted Hobbs Act Extortions, in violation of 18 U.S.C. § 1951 (Counts 3-8); and RICO Forfeiture.[1]

The Indictment alleges, <u>inter alia</u>, that the defendants used extortionate means, including the use of actual and threatened force, violence, and fear to obtain and attempt to obtain the following property:  wages and benefits to be paid pursuant to labor contracts (Count 1, Racketeering Acts 1B, 2B, 3B, 4B, 5B, 6, 7, 8, 9, 10B and 11B, Counts 3-8); jobs being performed by non-union laborers and the wages and benefits associated with those jobs (Count 1, Racketeering Acts 1A, 1B, 2A, 2B, 3A, 3B, 4A, 4B, 5A, 5B, 6, 7, 8, 9, 10A, 10B, 11A, 11B, Counts 3-8); the right to make business decisions free from outside pressure at construction projects (Count 1, Racketeering Acts 1A, 2A, 3A, 4A, 5A, 10A, 11A, Counts 3-8); wages and employee benefit contributions paid or to be paid by said contractors by unwanted, unnecessary and superfluous

---

[1] Unless otherwise indicated, the Superseding Indictment will be referred to as "the Indictment".

labor (Count 1, Racketeering Acts 1A, 2A, 3A, 4A, 5A, 10A, 11A, Counts 3-8).

## II.  LEGAL ARGUMENT

### A.  Standards Governing a Pretrial Motion to Dismiss an Indictment

Defendants move to dismiss each charge set forth in the Superseding Indictment, arguing, among other things, that based on the holding of the U.S. Supreme Court in <u>United States v. Enmons</u>, 410 U.S. 396 (1973) (hereinafter, <u>Enmons</u>), such counts are legally insufficient because the defendants were seeking to achieve legitimate labor union objectives.[2]  For the reasons set forth below, the defendants' motion to dismiss on this ground should be denied.

### 1.  The Indictment is Valid on its Face and Legally Sufficient

Fed. R. Cr. P. 12(b) provides that a motion to dismiss may raise "any defense, objection, or request which is capable of determination without a trial of the general issue."  A pre-trial

---

[2] This argument is set forth in the consolidated motion filed on behalf of the defendants by Brian M. Melber, Esq., counsel for defendant Mark N. Kirsch.  References to these pages will be denoted by "Melber Motion at ___."

motion to dismiss an indictment under Rule 12 must satisfy "a high standard." United States v. Lazore, 90 F. Supp. 2d 202, 203 (N.D.N.Y. 2000). "It is well settled that 'an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charges against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" United States v. Alfonso, 143 F.3d 772, 776 (2d Cir. 1998)(quoting Hamling v. United States, 418 U.S. 87, 117 (1974)). An indictment, therefore, "'need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" United States v. Stavroulakis, 952 F.2d 686, 693 (2d Cir. 1992) (quoting United States v. Tramunti, 513 F.2d 1087, 1113 (2d Cir. 1975).

On a motion to dismiss, the Court must accept the factual allegations contained in the Indictment as true and determine only whether the Indictment is "valid on its face." Costello v. United States, 350 U.S. 359, 363 (1956); see also United States v. Reynolds, 1999 WL 66536, at *3 (D. Conn. Jan. 22, 1999); United States v. Bicoastal Corp., 819 F. Supp. 156, 158 (N.D.N.Y. 1993). In deciding a motion to dismiss an indictment, the Court is not permitted to "look[] beyond the face of the indictment and [draw] inferences as to the proof that would be introduced by the

government at trial." <u>Alfonso</u>, 143 F.3d at 776. Absent a full and complete proffer of the evidence that the government intends to use at trial, "the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." <u>Alfonso</u>, 143 F.3d at 776-77; <u>see also</u> <u>United States v. Funderburk</u>,492 F.Supp.2d 223, 258 (W.D.N.Y. 2007); <u>United States v. Schlesinger</u>, 360 F.Supp.2d, 512, 521-22 (E.D.N.Y. 2005).

A particular defense is "capable of [pre-trial] determination" under Rule 12 "if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." <u>United States v. Covington</u>, 395 U.S. 57, 60 (1969).

Defendants also argue that the Indictment does not contain sufficient factual detail and that "what facts are presented are insufficient to state an offense" (Mahoney Motion at ¶ 2)[3] and that such "indictment is extremely sparse in identifying the conduct of any particular defendant" (Mahoney Motion at ¶ 2). Contrary to the defendants' argument, an indictment that tracks the statutory language, and provides approximate dates and places where the

---

[3] This argument is submitted in the consolidated motion filed on behalf of the defendant by Mark Mahoney, Esq., counsel for the defendant Gerald Bove. Reference to that page will be denoted by "Mahoney Motion at _____."

alleged conduct occurred, is legally sufficient to warrant a trial on the merits. See Stavroulakis, 952 F.2d at 693. Furthermore, the Court, in evaluating the defendants' motion to dismiss, must accept the factual allegations in the indictment as true. Costello, 350 U.S. at 363; see also Reynolds, 1999 WL 66536, at *3; Bicoastal Corp., 819 F. Supp. at 158.

Under the foregoing standards, the defendants' motion to dismiss the Indictment prior to the trial must be denied because the Indictment adequately alleges the disputed extortion charges. At best, defendant's argument is a factual rather than a legal argument and, therefore, is not appropriately addressed on a pretrial motion to dismiss. See Alfonso, 143 F.3d at 776. As held in United States v. Conqi, Docket No. 02-CR-73-A, January 16, 2004 at 21, "The indictment alleges that defendants attempted to obtain 'jobs' and the 'wages' and 'benefits' associated with such jobs. Such an allegation is legally sufficient to allege a Hobbs Act violation." Conqi, at 21. (Citing United States v. Green, 350 U.S. 415, 417, 420-21 (1956)).

**2.** **The Indictment is Not Subject to Dismissal Under the Enmons Decision.**

Defendants argue that all counts of the Indictment are legally insufficient because the defendants were pursuing legitimate union

-6-

objectives when they engaged in the charged conduct and, therefore, have a valid claim-of-right defense under Enmons (Melber Motion at ¶ 3, 8, 10, 12, 26, 35-36, 49, 53, 70-72). Assuming, arguendo, Enmons applicability, under the circumstances in this case, the defendants — in using extortionate means to obtain or attempt to obtain jobs, wages, and employment benefits — were not seeking to achieve legitimate labor union objectives and, thus, the Indictment should not be dismissed.

The argument advanced by the defendants warrants a brief discussion of the facts and holding in Enmons. In Enmons, the indictment alleged that the defendants, who were officials and members of labor unions, engaged in violence in furtherance of a conspiracy to obtain for striking employees higher wages and other employment benefits from a utility company. The acts of violence included "firing high powered rifles at three company transformers, draining the oil from a company transformer, and blowing up a transformer substation owned by the company." Id. at 398.

Relying on the plain language and legislative history of the Hobbs Act, the Supreme Court in Enmons held that acts of violence undertaken "to achieve legitimate collective bargaining objectives" are not prohibited by the Hobbs Act. Enmons, 410 U.S. at 404. The Supreme Court noted that the Hobbs Act defines "extortion" as "the

obtaining of property from another, with his consent, induced by **wrongful** use of actual or threatened force, violence, or fear." (emphasis added). Id. at 399-400. Based on the plain language of the statute, the Supreme Court reasoned that the inclusion of the term "wrongful" in the definition of extortion under the Hobbs Act "limits the statute's coverage to those instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property." Enmons, 410 U.S. at 400.

In addition, the Supreme Court determined that "[t]he legislative framework of the Hobbs Act dispels any ambiguity in the wording of the statute and makes it clear that the Act does not apply to the use of force to achieve legitimate labor ends." Id. at 401. In that respect, the Supreme Court noted, "[i]t was repeatedly emphasized in the debates that the bill did not 'interfere in any way with any legitimate labor objective or activity.'" Id. at 404.

Also, the Enmons Court determined that the predecessor of the Hobbs Act, Section 2 of the Anti-Racketeering Act of 1934, 48 St. At. 979, while similar to the Hobbs Act, contained an exception for the payment of wages by an employer to an employee. Id. at 401. On the basis of this Section 2 wage exception, in United

<u>States v. Local 807</u>, 315 U.S. 521 (1942), the Supreme Court held that the Anti-Racketeering Act did not cover a scheme by New York City Teamsters to coerce payments for themselves from out-of-town truckers in return for the unwanted service of having Teamsters drive the trucks into the city while, alternatively, allowing the out-of-town truckers to drive into the city themselves.  <u>Id.</u> Alarmed by the Court's decision in <u>Local 807</u>, Congress swiftly introduced what became the Hobbs Act, for the purpose of eliminating the wage exception that had been the basis for the <u>Local 807</u> decision.  <u>Id.</u>

The <u>Enmons</u> majority emphasized, however, that "by eliminating the wage exception of the Anti-Racketeering Act, the Hobbs Act did not sweep within its reach violence during a strike to achieve legitimate collective-bargaining objectives."  <u>Id.</u> at 404. Statements made during the Congressional debates preceding the Act's passage stressed that the Act "does not have a thing in the world to do with strikes," and that it would not "interfere in any way with any legitimate labor objective or activity."  <u>Id.</u> at 409 (<u>quoting</u> 91 Cong. Rec. 11912, 11841).  The Court also voiced its own concern that if the Hobbs Act were not interpreted to exclude strike violence, it would work "an extraordinary change in federal labor law" by requiring the federal government to police orderly strike conduct, and by subjecting "the worker who threw a punch on

the picket line, or the striker who deflated the tires on his employer's truck" to stiff criminal penalties of up to 20 years imprisonment. Id. at 410-11. The Court determined that neither the statutory language nor legislative history justified this result. Id.

While Enmons did not discuss what conduct constitutes "legitimate labor objectives" other than striking for higher wages, the Supreme Court, however, illustrated circumstances where violence committed by union officials or members would fall within the scope of the Hobbs Act. Specifically, the Supreme Court stated that the Hobbs Act prohibits acts of extortion that are designed to obtain property where "the alleged extortionist has no lawful claim to that property." Id. at 400. The Court stated that "the Hobbs Act has properly been held to reach instances where union officials threatened force or violence against an employer in order to obtain personal payoffs, and where unions used the proscribed means to exact 'wage' payments from employers in return for 'imposed, unwanted, superfluous and fictitious services' of workers." Id. (footnotes omitted).

Since Enmons, courts have applied it conservatively and have held that the Enmons defense does not exempt from coverage under the Hobbs Act various illegitimate labor objectives. For example,

in United States v. Zappolla, 677 F.2d 264, 269 (2d Cir. 1982), the Court declined to extend Enmons beyond the labor context. The Court stated, "We see no reason to extend Enmons to non-labor cases in derogation of Congress' express intent to incorporate the traditional state law of extortion." Zappolla, 677 F.2d at 269.

In United States v. Porcaro, 648 F.2d 753 (1st Cir. 1981), the defendant and others were charged with racketeering and extortion offenses. Porcaro, 648 F.2d at 754. The Court, in determining whether Enmons should apply, stated:

> It could be reasonably inferred that appellant's assertion of property rights to the premises was a mere pretext, resorted to only after attempts to obtain the property (or money) prematurely through intimidation had failed. Enmons does not permit a subsequently conceived, post-violence legal claim to property to sanitize retroactively an attempted extortion.

Porcaro, 648 F.2d at 760.

In United States v. Cerilli, 603 F.2d 415, 419 (3d Cir. 1979), the defendants were charged with Hobbs Act extortion. In response to the defendants' claim that Enmons precluded their prosecution, the Court stated, "Enmons is a labor case. The Court's reasoning was obviously and explicitly tied to the labor context and more specifically to the strike context. Any application of Enmons to cases outside of that context must be done with caution." Cerilli,

603 F.2d at 419; see also, United States v. Daans, 475 F.3d 1114
(8th Cir. 2007) (refusal to extend Enmons beyond labor context).

Within the labor context, the courts have been reluctant to
extend Enmons to union activities beyond the scope of the
traditional employer and employee labor dispute.  For instance, in
United States v. Debs, 949 F.2d 199 (6th Cir. 1991), in which one
union member committed acts of violence against another during an
election campaign, the court rejected the defendant's argument that
he could not be prosecuted under the Hobbs Act because campaigning
and union elections "is a legitimate labor objective".  Id. at 200.
The court stated that if every union activity were held to be
"within the orbit of Enmons[,] [s]uch a holding would immunize
union members from sanction so long as their otherwise illegal
action is committed in the context of labor activity.  We decline
to expand Enmons this far."  Id. at 201; see also, United States v.
Jones, 766 F.2d 994, 1002-3 (6th Cir. 1985) (doubting whether Enmons
covers the use of violence to persuade employees of a non-union
employer to join the union, because such conduct is "outside of the
collective bargaining context and in pursuit of goals other than
higher wages and against individuals other than the striker's
employer."); United States v. Stofsky, 409 F. Supp. 609, 616
(S.D.N.Y. 1973) ("[it] must be recognized that Enmons deals
specifically with employer-employee disputes . . . ").

Racketeering Acts 1-5, 10 of Count 1, and Counts 3 through 8, allege attempted extortions in violation of the Hobbs Act. In addition, Racketeering Act 11 of Count 1 and Count 2 allege a conspiracy to commit Hobbs Act extortion. Even under an expansive reading of <u>Enmons</u>, the defendants' conduct is culpable under the Hobbs Act because the defendants were not acting in pursuit of legitimate union ends when they committed the alleged conduct. Numerous courts have held that the <u>Enmons</u> defense does not except from coverage under the Hobbs Act various illegitimate labor objectives including the defendants' objective in this case, the replacement of existing workers. <u>See, e.g.</u>, <u>United States v. Mulder</u>, 273 F.3d 91, 104-05 (2d Cir. 2001) (efforts to coerce an employer to, among other matters, hire union members to replace non-union employees); <u>United States v. Debs</u>, 949 F.2d 199, 200-01 (6th Cir. 1991) (union president threatened violence against his opponent in union election to induce him to withdraw his candidacy); <u>United States v. Traitz</u>, 871 F.2d 368, 380-82, 393 (3d Cir. 1989) (payment of "fines" from an employer, which violated collective bargaining agreement); <u>United States v. Cusmano</u>, 729 F.2d 380, 382-83 (6th Cir. 1984) (health and pension contributions in violation of collective bargaining agreement); <u>United States v. Wilford</u>, 710 F.2d 439, 442-45 (8th Cir. 1983) (forcing non-union drivers to pay an unloading fee to union local when the payors would not receive any services from the union); <u>United States v.</u>

Russo, 708 F.2d 209, 214-15 (6th Cir. 1983) (health and pension contributions in violation of collective bargaining agreement); United States v. Jacobs, 543 F.2d 18, 19-21 (7th Cir. 1976) (demand for recognition by union not certified by NLRB to represent a majority of employees); Mariah Boat, Inc. v. Laborers International Union of North America, 19 F. Supp. 2d 893, 901 n.4 (S.D. Ill. 1998) (union campaign to run employer "out of business"); A. Terzi Productions, Inc. v. Theatrical Protective Union, 2 F. Supp. 2d 485, 506-07 (S.D.N.Y. 1998) (demand to sign labor agreement with union which was not certified by NLRB to represent majority of employees); Domestic Linen Supply & Laundry Co. v. Central States, Southeast & Southwest Areas Pension Fund, 722 F. Supp. 1472, 1476-77 (E.D. Mich. 1989) (strike to compel employer to include supervisory employees in collective bargaining unit contrary to NLRA); C&W Construction Co. v. Brotherhood of Carpenters and Joiners of America, Local 745, 687 F. Supp. 1453, 1468-69 (D. Hawaii 1988) (union's picketing and violence to induce employer to sign collective bargaining agreement with union where union was not certified by NLRB as representative of majority of employees).

Moreover, the proof at trial will show that defendants acknowledged their non-legitimate labor union objectives. For example, on January 30, 2006, defendant Kirsch signed a "Notice to Employees and Members" posted pursuant to a Settlement Agreement

with Earth Tech, Inc. approved by the National Labor Relations Board stating:

**WE WILL NOT** do anything that interferes with, restrains or coerces you with respect to these rights. More specifically,

**WE WILL NOT** picket or cause to be picketed Earth Tech, Inc., where an object thereof is to force or require Earth Tech, Inc. to recognize or bargain with us as the representative of its employees, or where an object is to force or require the employees of Earth Tech, Inc. to accept or select us as their collective-bargaining representative without a representation petition under Section 9(c) of the Act having been filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing.

**WE WILL NOT** block vehicles from entering or exiting job sites of Earth Tech, Inc.

**WE WILL NOT** physically assault supervisors of Earth Tech, Inc. on or near our picket line.

**WE WILL NOT** inflict property damage to vehicles at the Earth Tech, Inc. site.

**WE WILL NOT** vandalize locks or install locks impeding entrance gates at Earth Tech, Inc. sites.

**WE WILL NOT** attempt to inflict property damage to Earth Tech, Inc. vehicles by throwing sharp and metal objects on the driveway at Earth Tech, Inc.

**WE WILL NOT** attempt to inflict property damage to Earth Tech, Inc. vehicles by following employees of Earth Tech, Inc. in their vehicles, or by driving recklessly while driving near employees and their vehicles after they leave the job site.

**WE WILL NOT** threaten employees with unspecified reprisals by stating in their presence that supervisors of Earth Tech, Inc. will get home late, because Earth Tech, Inc. refused to recognize the International Union of Operating

Engineers, Local 17, as the collective bargaining representative of certain employees of Earth Tech, Inc.

Also, on November 15, 2005, defendant Mark N. Kirsch, President, signed a "Notice to Employees and Members" posted pursuant to a Settlement Agreement with Ontario Speciality Contracting, Inc. approved by the National Labor Relations Board, stating:

> **WE WILL NOT** do anything that interferes with, restrains or coerces you with respect to these rights. More specifically,
>
> **WE WILL NOT** picket or cause to be picketed Ontario Specialty Contracting, Inc., where an object thereof is to force or require Ontario Specialty Contracting, Inc. to recognize or bargain with us as the representative of its employees, or where an object is to force or require the employees of Ontario Specialty Contracting, Inc. to accept or select us as their collective-bargaining representative without a representation petition under Section 9(c) of the Act having been filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing.
>
> **WE WILL NOT** block vehicles from entering or exiting job sites of Ontario Specialty Contracting, Inc.
>
> **WE WILL NOT** inflict property damage to vehicles at the Ontario Specialty Contracting, Inc. site.
>
> **WE WILL NOT** throw sharpened metal objects on the driveway at Ontario Contracting, Inc.
>
> **WE WILL NOT** vandalize locks impeding entrance gates at Ontario Specialty Contracting, Inc. job sites.
>
> **WE WILL NOT** threaten to follow supervisors to their home from the picket line and to inflict unspecified reprisals upon supervisors, as well as threaten to throw bricks through the window of a supervisor's house because

Ontario Specialty Contracting, Inc. refused to recognize the International Union of Operating Engineers, Local 17, as the collective bargaining representative of certain employees of Ontario Specialty Contracting, Inc.

**WE WILL NOT** physically assault supervisors of Ontario Specialty Contracting, Inc. in the presence of employees at or near the picket line, by pushing and shoving supervisors, and by throwing a hot beverage at one of them.

Despite this overwhelming authority and anticipated proof at trial, defendant Kirsch contends that his conduct "was directed toward obtaining a legitimate objective of organized labor union activity [and, thus,] that conduct cannot give rise to attempted extortion under either the Hobbs Act or the New York Penal Law . . . " (Melber Motion at ¶ 20, p. 6). Moreover, according to the defendant, "Because these objectives are not themselves unlawful, defendants cannot be found guilty of any crime of extortion, no matter what means is alleged or employed in an effort to obtain these objectives." Id. at ¶ 36, p. 9. See also ¶ 26, p. 7. Finally, it is contended by defendant Kirsch that "Nowhere is it alleged that Mr. Kirsch engaged in illegal acts as a means of pursuing those objectives." (Melber Motion at ¶ 49, p. 12.) With regard to this point, the defendant ignores the allegations in the Indictment that the defendant, as alleged in the Indictment, "did attempt to obtain property . . . induced by the wrongful use of actual and threatened force, violence and fear, including fear of economic harm resulting from actual and threatened physical

violence." This is the legal act which is repeated continuously in the Indictment that the defendant ignores in his argument that "[n]owhere is it alleged that Mr. Kirsch engaged in illegal acts as a means of pursuing those objectives." Melber Motion at ¶49, p. 12.

The defendant Kirsch also contends that in order to have a valid Hobbs indictment in the labor context, the property sought to be obtained must be "demands for personal payoffs or kickbacks or pay for fictional jobs or workers." Melber Motion at ¶9, p. 2. Moreover, he claims that "[i]n particular, the superceding indictment nowhere alleges that any defendant sought to obtain a personnel payoff or kickback or payment other than the payment of wages or other compensation." Melber Motion at ¶ 31, p. 8. Just as defendant Kirsch argues here, in United States v. Green, 350 U.S. 415 (1956), the defendant argued that the Hobbs Act would apply only if defendant's conduct sought to obtain property for the personal benefit of the union or its agent. Green, 350 U.S. at 420. The Supreme Court, in referring to a former holding, United States v. Local 807, 315, U.S. 521 91942), disagreed. "The city truckers in the Local 807 case similarly were trying by force to get jobs and pay from the out-of-state truckers by threats and violence. The Hobbs Act was meant to stop just such conduct. Extortion as defined in the statute in no way depends upon having

a direct benefit conferred on the person who obtains the property."
Green, 330 U.S. at 420; See also, United States v. Clemente, 640
F.2d 1069, 1079-80 (2d Cir. 1981) ("whether a Hobbs Act defendant
personally receives any benefit from his alleged extortion is
largely irrelevant for the purpose of determining guilt."); United
States v. Coffey, 361 F.Supp. 2d 102, 109 (E.D.N.Y. 2005) (the fact
that neither [defendant] may have personally benefitted from the
charged conduct under the Hobbs Act . . . has no legal
significance.)

The defendant Kirsch attempts to analyze the four forms of
property and objectives alleged in the Indictment and concludes,
through this analysis, that the efforts of the defendants were for
legitimate union objectives.  The government maintains that the
property alleged to have been extorted is within the reach of the
Hobbs Act.  In United States v. Daley, 564 F.2d 645, 647 (2d Cir.
1977), a union official arranged for a contractor to deliver
materials to the cabin of defendant, a union official.  Id. at 648.
The contractor testified that he agreed to deliver the materials so
that his drivers would not lose work.  Daley, 564 F2d at 648.
Also, owner-operator drivers testified that they felt threatened
they would lose their jobs if they refused to deliver materials.
Id. at 648.  The Court stated, "here, the victims of Daley's scheme
of extortion were workers and contractors on the New York Thruway,

a major artery of interstate commerce. The threats which forced compliance were the loss of continued opportunities to work on that interstate highway." Id. at 649. The Second Circuit characterized this conduct as "illegitimate labor union activities." Daley, 564 F.2d at 651 f.n. 5.

### a. **Unwanted, Unnecessary and Superfluous Labor**

Racketeering Acts 1-5 and 10-11 and Counts 2-8 allege that the defendants attempted to obtain "wages and benefits . . . for the unwanted, unnecessary, and superfluous labor . . . ". The Enmons Court specifically stated that "the Hobbs Act has properly been held to reach instances . . . where unions used the proscribed means to exact 'wage' payments from employers in return for 'imposed, unwanted, superfluous and fictitious services' of workers." Enmons, 410 U.S. at 400 (footnotes omitted). Racketeering Acts 1-5 and 10-11 and Counts 2-8, therefore, fall squarely within the exception to the Enmons rule articulated by the Supreme Court. Enmons, 410 U.S. at 400; see also United States v. Green, 350 U.S. 415, 417 (1956); United States v. Robilotto, 828 F.2d 940, 943-45 (2d Cir. 1987).

### b. The Right to Make Business Decisions Free from Outside Pressure.

The defendant Kirsch characterizes all objectives alleged in the Superseding Indictment as lawful including the objective of obtaining "the property of construction contractors and businesses consisting of the right to make business decisions free from outside pressure at construction projects in Western New York." The defendant then maintains that all the property sought to be obtained was through "collective bargaining agreements under which union members would be employed and earn lawful wages and other compensation for actual work." (Melber Motion at ¶ 53). The defendant first mischaracterizes the allegation that the "business decisions" alleged in the Indictment "refers to the decision by an employer, a construction contractor, with regard to whether or not to enter into a collective bargaining agreement with a union or instead to employee non-union employees under an at will employment arrangement." The government disputes this. While this is part of what is sought to be obtained, what was forcefully sought by the enterprise and the defendants through intimidation, and threats and fear, not through negotiation, but through force, was a usurpation of any contract and, instead, that the enterprise would dictate decisions made generally by the contractor. Under defendant Kirsch's reasoning, any form of violence, including presumably murder, is justified where union personnel attempt to have a non-

union contractor sign an agreement.  Thus, under his reasoning, any criminal act committed by union personnel would be immune from prosecution as long as it was claimed that it was for the purpose of getting a contract signed.

Indeed, evidence at trial will show that in many instances, when an owner or supervisor attempted to negotiate, they were told that there would be no negotiation and if there was a refusal to sign the union "agreement" there would be repercussions. Surprisingly, defendants' statements that they were attempting to follow legitimate union objectives in reaching a collective bargaining agreement is belied by evidence that the union disregarded the "collective bargaining contract."  For example, after Wadsworth Golf Construction signed an agreement with Local 17, a Wadsworth representative, consistent with the agreement, requested that one of the positions on the project be filled with one of Wadsworth's experienced employees.  Defendant Thomas Freedenberg, a Local 17 representative on the project told the Wadsworth representative that their agreement "doesn't mean shit."

More importantly, the actions of the defendant and the others were beyond the legitimate objective of a legitimate union purpose. Instead, the actions sought to destroy companies who refused their demands through unsubstantiated NLRB charges, picketing and slow

downs, destruction of equipment and threats to non-union employees, contractors and their families. The Local 17 union organizers' marching orders were to "turn or burn", that is, to force a company to sign a labor agreement or to destroy the company.

In attacking the indictment's assertion that the defendants attempted to obtain the "construction contractors" right to make business decisions free from outside pressure", both defendants Kirsch and Bove claim that "an employer enjoys no 'right' to make that decision free from outside pressure.", <u>Mahoney Motion</u> ¶23, p. 9; <u>Melber Motion</u>, ¶61, p. 14. Defendant Bove characterizes this property right as "not 'property' at all but . . . merely fictitious 'rights' which have been contrived ad hoc and treated as if they were 'property', in order to create a new criminal offenses for this case." <u>Id</u>. at ¶23, p. 9. Also, defendant Bove states "There is no right to a job in New York and the indictment fails to specify that any of the nonunion construction laborers in this case were other than 'at will' employees." <u>Id.</u> at ¶23. Defense counsel further ridiculed this concept by stating:

> It is ludicrous to suggest that any business has "the right to make business decisions free from outside pressure." Indeed, it is not only an asinine concept, it is impossible, for the varying nature of "business" involves a marketplace where there are inherent "outside pressures" from political, economic, regulatory, social, historical and myriad other sources.

Id. at ¶24.  Defendant Bove also states that by the adoption of the National Labor Relations Act, laborers were authorized "to exert 'outside pressure' on businesses to force them to enter into and adhere to collective bargaining agreements with unions which they would not voluntarily do without such 'outside pressure'."  Id. at 25.  The defendant's assertion is inconsistent with the Second Circuit and Supreme Court precedent.

In United States v. Tropiano, 418 F.2d 1069 (2d Cir. 1969), defendants were charged in a four-count indictment to extortion and attempted extortion in violation of the Hobbs Act.  The thrust of the indictment was that the defendants attempted to force a company to not solicit any more business in a certain area.  Tropiano, 418 F.2d at 1072.  The defendants contended that the Hobbs Act charge could not stand because no property was extorted and that "nothing more than 'the right to do business' . . . was surrendered . . . and that such a right was not 'property' 'obtained' by the defendants . . . "  Id. at 1075.  The Second Circuit stated, "The concept of property under the Hobbs Act has devolved from its legislative history in numerous decisions, is not limited to physical or of tangible property or things."  Tropiano, 418 F.2d at 1075, (citing United States v. Provenzano, 334 F.2d 678 (3d Cir. 1964)).  The Second Circuit found that property "includes, in a broad sense, any valuable right considered as a source or element

of wealth and does not depend upon a direct benefit being conferred on the person who obtains the property." Id. at 1075-76. The Court concluded "[The victim's] right to solicit accounts in Milford, Connecticut constituted property within the Hobbs Act definition." Accord, United States v. Margiotta, 688, F.2d 108, 134 (2d Cir. 1982) (continuation of insurance business); United States v. Arena, 180 F.3d 380, 392 (2d Cir. 1999) ("property" includes the right to conduct a business free from wrongful force, coercion, or fear."). See also, United States v. Lewis, 797 F.2d 358, 363-64 (7th Cir. 1986) (protecting the right to hire employees); United States v. Zemek, 634 F.2d 1159, 1174 (9th Cir. 1980) (finding that a victim's right to solicit business free from threatened destruction and physical harm falls within the scope of protected property rights under Hobbs Act); United States v. Nadaline, 471 F.2d 340, 344 (5th Cir. 1973) (discussing the right to solicit business: "such intangible property has been held to be included within those rights protected by the [Hobbs] Act"); United States v. Arena, 180 F.3d 380, 394 (2d Cir. 1999) (stating that property includes the "right to conduct a business free from threats of violence and physical harm") (emphasis added), aff'g United States v. Arena, 918 F. Supp. 561, 568 (N.D.N.Y. 1996) ("The court starts from the uncontested proposition that the right to conduct a lawful business free from threats and violence is property within the meaning of the Hobbs Act." (citing Town of West

<u>Hartford v. Operation Rescue</u>, 915 F.2d 92, 101 (2d Cir. 1990), and

<u>Tropiano</u>, 418 F.2d at 1077)); <u>United States v. Hoelker</u>, 765 F.2d

1422, 1425 (9th Cir. 1985) (protecting not only the money extorted

from the victim by those who forced him to buy a life insurance

policy naming them as the beneficiaries, but also the victim's

"right to make personal and business decisions about the purchase

of life insurance on his own life free of threats and coercion")

(emphasis added); <u>United States v. Santoni</u>, 585 F.2d 667, 673 (4th

Cir. 1978) (protecting the right to make business decisions free

from outside pressure wrongfully imposed.


More recently, in <u>United States v. Gotti</u>, 459 F.3d 296 (2d

2006), the Second Circuit noted that <u>Scheidler v. National

Organization for Women, Inc.</u>, 537 U.S. 393 (2003) ("Scheidler II"),

had dealt with the issue of intangible rights and, in fact,

referenced <u>Tropiano</u>.  <u>Gotti</u>, 459 F.3d at 322-23.  The Second

Circuit stated:


> We easily conclude that <u>Scheidler II</u>, did not overturn
> <u>Tropiano</u>'s broad interpretation of the Hobbs Act
> reference to "property" nor otherwise suggest that only
> tangible property rights can be extorted under the Hobbs
> Act.  The <u>Scheidler II</u> majority, in going out of its way
> to emphasize that it was not reaching <u>Tropiano</u>,
> essentially said as much.

Id. at 323.  The Court concluded by saying, "We therefore read Scheidler II as leaving in tact this Circuit's precedent that intangible property rights can qualify as extortable property under the Hobbs Act . . . " Gotti, 459 F.2d at 323.

Based on the foregoing, it is clear that the indictment properly alleges that the defendants conspired and attempted to extort property from various employers and their employees by means of the wrongful use of force, violence and fear, including fear of economic harm because the indictment alleges that the defendants acted without a legitimate labor union objective in using violence and threats of violence in an effort to induce employers to unlawfully replace their employees with other persons who were members of Local 17.  Therefore, the charged conduct is not protected by the Enmons claim of right defense.

3.   **The Enmons Claim of Right Defense Does Not Apply to the Alleged Predicate Acts Under the Hobbs Act 18 U.S.C. §1951).**

   A)  Demands for Unwanted and Unnecessary Fictitious Labor

In United States v. Robilotto, 828 F.2d 940, 943-45 (2d Cir. 1987), the Second Circuit upheld the Hobbs Act conviction of labor union officials who had demanded wage payments from movie producers for the "unwanted, unnecessary and fictitious services of employees

known as 'cover drivers'."  On appeal the court explained that in

addition to being unwanted and unnecessary, the proffered work of

the cover drivers was a sham and tantamount to a wage exaction for

fictitious services not performed and not to be performed:

> Apparently conceding that the cover drivers were both
> superfluous and fictitious, Robilotto argues that the demand
> to pay cover drivers was neither imposed upon, nor unwanted
> by, Universal because Universal eventually "agreed" to pay the
> cover drivers. However, Universal consented to payment of
> those salaries only after threats of labor unrest made by
> Civitello and later by Robilotto. Under Robilotto's singularly
> circular logic, once Universal consented to making
> extortionate payments upon pain of labor strife, that consent
> would then evidence Universal's willingness to accept the
> previously unwanted contract term. At most, Universal's
> subsequent agreement to hire the cover drivers demonstrates
> only that appellants' extortion was successful. Moreover, the
> cover drivers at issue here, for the most part, were not
> members of the union, performed no work, and were incapable of
> performing the jobs that they purportedly were covering. It
> would be difficult to imagine a more obvious instance of
> imposed, unwanted, superfluous and fictitious labor services.
> See United States v. Green, 350 U.S. 415, 417, 76 S.Ct. 522,
> 524, 100 L.Ed. 494 (1956). Appellants' attempts to force
> Universal to hire cover drivers clearly fall within the type
> of illegitimate labor activity proscribed in Green. We hold,
> therefore, that the Hobbs Act indictment against appellants
> stated a criminal offense, and that the exception envisioned
> in Enmons for legitimate union activity is inapplicable to the
> instant case.

828 F.2d at 945 (emphasis added).


The Second Circuit's holding in Robilotto is fully consistent

with federal labor law which forbids labor organizations and their

agents "to cause or attempt to cause an employer to pay or deliver

or agree to pay or deliver any money or other thing of value, in

the nature of an exaction, for services which are not performed or

not to be performed."  29 U.S.C. § 158(b)(6).  As the Supreme Court

explained in <u>American Newspaper Publishers' Ass'n. v. National</u>

<u>Labor Relations Board</u>, 345 U.S. 100 (1953), section 158(b)(6) was

> . . . intended to make it an unfair labor practice for a man
> to say, "You must have 10 musicians, and if you insist that
> there is room for only 6, you must pay for the other 4
> anyway.' That is in the nature of an exaction from the
> employer for services which he does not want, does not need,
> and is not even willing to accept.'

345 U.S. 110-111 (quoting Senator Taft's remarks on June 5, 1947,

about section 158(b)(6) at 93 Cong.Rec. 6446).

B)  Demands for Unnecessary and Unwanted Replacement Labor

More recently, however, the Second Circuit upheld the

extortion conspiracy convictions of minority coalition leaders and

their organized crime associates in a prosecution of labor-related

abuses involving demands for unwanted and unnecessary labor in the

construction industry.  <u>United States v. Mulder</u>, 273 F.3d at 91.

In <u>Mulder</u> the Court of Appeals approved the trial court's jury

instruction concerning the labor claim of right defense formulated

in <u>Enmons</u>.  The jury instruction had distinguished legitimate "good

faith efforts to obtain jobs for minorities from contractors or

subcontractors who the defendants reasonably believe discriminate

against minorities in hiring employees, or who the defendants

reasonably believe failed to obey the law regarding the employment of minorities" and illegitimate "efforts to obtain jobs from contractors whom the defendants reasonably believed did not discriminate or violate employment laws, or efforts to obtain money or wages for unwanted or superfluous employees[,] no show-jobs[,] or contracts, or other valuable consideration." <u>Mulder</u>, 273 F.3d at 105 (quoting from the Second Circuit's earlier decision in <u>United States v. Taylor</u>, 92 F.3d 1313, 1319 (2d Cir. 1996), which had upheld minority coalition leaders' Hobbs Act convictions for extortion of a fictitious "coordinator's fee" and commercial subcontracts for services).

Moreover, the Second Circuit's decision in <u>Mulder</u> further explained that in addition to wages paid for fictitious and no-show jobs given to coalition leaders and Gambino organized crime family members (discussed at 273 F.3d 103), defendant-coalition leaders had demanded and received the hiring and payment of both additional, unnecessary laborers and laborers who replaced existing workers. Compare discussion of additional laborers in <u>Mulder</u>, 273 F.3d at 110 (reviewing Defoe Corporation's hiring of two additional, unneeded laborers from a minority coalition with the concurrence of the Gambino family and demands "to hire more workers than their agreement allowed") and discussion of replacement workers in Mulder, 273 F.3d at 111-12 (reviewing Tully

Construction's discharge of one worker to permit the hiring of another as a "replacement worker"sent by a minority coalition, the dispute between rival minority groups concerning the replacement of coalition workers which resulted in a shoot-out at the job site, and a request to discharge "a minority worker from Red Hook" in order to hire a worker from different minority coalition).  See also, Mulder, at 273 F.2d at 102.

Moreover, the Hobbs Act reaches farther than the Taft-Hartley Act's prohibition against exaction of wages for fictitious labor in 29 U.S.C. § 158(b)(6) because the Hobbs Act was enacted on July 3, 1946 (60 Stat. 420) in a different Congress and almost a year before section 158(b)(6) was enacted as part of the Taft-Hartley Act on June 23, 1947 (61 Stat. 140).  This point was noted by the Supreme Court in Green, supra, when it explained that its decision in American Newspaper Publishers Ass'n., supra, excluding the prohibition in section 158(b)(6) of demands for bona fide "made work," had no application to the demands for unnecessary and superfluous services of bulldozer swampers, albeit services to be performed, in violation of the Hobbs Act.  Green at 350 U.S. 420-21 footnote 3 (citing the lower court's erroneous reliance on American Newspaper Publishers in United States v. Green, 135 F.Supp.162 (S.D. Ill. 1955)) and footnote 6 (noting later enactment of section 158(b)(6)).

The Second Circuit's upholding of the Hobbs Act's application to coercive demands for the hiring of replacement workers as an illegitimate labor objective is also consistent with federal labor law. In <u>Austin & Wolfe Refrigeration, Air Conditioning and Heating, Inc.</u>, 202 NLRB 135 (1973), a sheet metal workers union insisted, as a condition of executing an agreement subject to 29 U.S.C. § 158(f), that the construction industry employer discharge all sheet metal workers then in its employ and replace them with workers referred from the union's hiring hall. The National Labor Relations Board ruled that:

> the discharge of an employee at the insistence of a union because he had not been referred by the union's hiring hall, or because he was not receiving union scale, is the plainest kind of discrimination. . . . [C]ertain forms of discrimination may be permissible, as where an employer and a union have agreed that hiring shall be done through a nondiscriminatory union-operated hiring hall. But such a lawful hiring-hall clause cannot be applied retroactively, that is, to justify the discharge of an employee who was hired before the hiring-hall clause became operative.

202 NLRB at 135 (citation omitted) (emphasis added). <u>Accord</u>, <u>Local Union No. 323, Int'l Bro. of Electrical Workers</u>, 242 NLRB 305, 305, 316 (1979) (finding unlawful union's demand to terminate existing employees following execution of section 158(f) agreement, but demand to adhere to hiring hall arrangement for future hires not unlawful); <u>Int'l Longshoremens Ass'n, Local 1426</u>, 307 NLRB 948, 948 (1992) (finding unlawful union's insistence on retroactive

application of hiring hall rules so that existing employees could be discharged).

Under the federal labor laws, as amended in 1959, a labor union may request that an employer engaged primarily in the construction industry enter into a prehire agreement requiring union membership as a condition of employment, if not otherwise prohibited by state law, despite the fact that no employees have been hired at a particular construction project and the union does not represent a majority of employees who will be employed on the project. See discussion of 29 U.S.C. § 158(f) agreements in Higgins, et al., THE DEVELOPING LABOR LAW (5th ed. 2006) Vol. I, chapter 13, p. 1036. A labor union may lawfully negotiate a labor agreement with an employer in the construction industry pursuant to 29 U.S.C. §158(f) that includes a hiring hall referral system in which the employer relies on the union to refer industry employees on an as-needed basis. The statute expressly permits the agreement to include a union security clause whereby any workers hired by the employer must join (i.e. pay membership dues or agency shop fees) within seven days of their hiring (§ 158(f)(2)). Moreover, the agreement may specify minimum qualifications or the priority in which referrals must be made based on the prospective employee's training and experience or length of service (seniority) with the

employer, in the industry, or residence in the geographical area
served by the hiring hall (§ 158(f)(4)).

For example, in a decision that is frequently cited in the
case law, the National Labor Relations Board upheld a finding that
a union did not operate a discriminatory hiring hall when
scheduling overtime work by giving preference to local union
members and local residents over non-resident workers traveling to
the work site.  <u>Local Union 8 IBEW (Romanoff Electric)</u>, 221 NLRB
1131 (NLRB 1975).  In Local Union 8 the Board concluded that

> absent a finding of pretext or sham, preferential hiring or
> job retention based on an objective criterion, particularly in
> the construction industry, would not be violative of the Act.
> <u>A priori</u>, the preferential assignment of unscheduled overtime
> should not constitute an unfair labor practice where it is
> based on the objective criterion of area residence. The Board
> has long held that a union is not prohibited from trying to
> ease the impact of local unemployment by attempting to cause
> employers to limit work opportunities to strictly local
> applicants.
>
> It is also clear that a union violates Section 8(b)(1)(A)
> of the National Labor Relations Act when, under an exclusive
> hiring agreement with an employer, it accords its own members
> preference in job referrals over nonmembers utilizing its
> hiring facilities. Obviously, a union which insists upon
> preferential treatment of its own union members for the
> performance of unscheduled overtime work could violate the Act
> if, e.g., it is motivated for the purpose of enforcing or
> encouraging compliance with union-related obligations or
> adherence to the union in some other respect. We agree with
> the Administrative Law Judge that "a presumed or professed
> concern for local unemployment cannot prevail over proof of
> discriminatory intent to favor union members." However, we
> find such proof lacking in the instant case.

. . . . Respondents state, and it is not disputed, that travelers are less dependable than area workers and that local experience has indicated that job completion schedules are usually met with area men and not travelers. Consequently, they accord preferential treatment in the assignment of unscheduled overtime to employees residing in the area. Such discrimination is clearly not per se unlawful nor does the nexus seem so suspicious as to require the Board to substitute its wisdom for that of the parties.

221 NLRB at 1131-32 (footnotes and other citations omitted).


On the other hand, in operating the hiring hall referral system, the union and its agents may not discriminate against a prospective employee based on the employee's lack of union membership or membership in a different union or on the basis of race, sex, citizenship or other protected classifications such as age, or under circumstances in which the hiring system is operated without any objective standards as where the hiring hall is operated "at the whim of those handling the referral service." See THE DEVELOPING LABOR LAW, supra at Vol II, chap. 26 pp. 2164-66 (citing cases).


        C) Wrongful Demands for Hiring of Unwanted and
               Unnecessary Replacement Labor


Applying these concepts, Local 17 and its agents could have lawfully demanded that the employer agree that the contractor's existing employees join Local 17 within seven days, by paying member dues or agency shop fees, and that any future employees be

referred from Local 17's hiring hall.  However, Local 17 and its agents could not demand that those existing employees be removed from the workplace or be replaced by Local 17 members by means of the discriminatory operation of the union's hiring and referral system.  The latter objectives are not a legitimate union objectives for purpose of the _Enmons_ claim of right defense.

Consequently, a defendant's actual or threatened use of force, violence or fear of violence or economic harm, would violate the Hobbs Act if done for the purpose of inducing the employer's consent to the obtaining of the hiring and payment of unwanted or unnecessary workers in order to wrongfully replace existing employees whom the defendant knew would not be allowed to join Local 17 and have the opportunity to seek work through Local 17's referral system.

**4.    The _Enmons_ Claim of Right Defense Does Not Apply to the
        Alleged Predicate Acts Under New York Penal Law.**

Count 1 of the Indictment charges several of the defendants
with participating in a RICO conspiracy.  That count alleges 11
Racketeering Acts, each of which asserts a violation of New York
State Penal Law as a predicate crime for the RICO conspiracy.[4]
These state law predicate offenses allege alternative theories,
wholly independent of the Hobbs Act.  The _Enmons_ defense does not
apply at all to these state law violations.

The claim of right defense adopted in _Enmons_ is not required
by the Constitution.  Rather, the Supreme Court based that defense
entirely on the particular language of the Hobbs Act and its unique
legislative history.  For example, the Supreme Court stated:

> The legislative framework of the Hobbs Act dispels any
> ambiguity in the working of the [Hobbs Act] and makes it
> clear that the Act does not apply to the use of force to
> achieve legitimate labor ends.

---

[4] RA 6 through 9 of the Indictment are based solely on violations
of New York State Penal Law.  The remaining Racketeering Acts are
based on both violations of the Hobbs Act (RA 1A, 2A, 3A, 4A, 5A,
10A and 11A, and violations of New York State Penal Law (1B, 2B,
3B, 4B, 5B, 10B and 11B.

Enmons, 410 U.S. at 401.  The Supreme Court then pointed to several statements in the Congressional Record supporting the above-quoted conclusion of the Supreme Court.  See id. at 402-07.


In accordance with the specific legislative history indicating that Congress did not intend the Hobbs Act to proscribe "the use of force to achieve legitimate labor ends," several federal courts have held that Enmons establishes a limited defense for certain labor cases under the Hobbs Act where it is clear that the objectives were entirely lawful.  See, e.g., United States v. Cohen, 738 F.2d 287, 289 (8th Cir. 1984); United States v. Zappola, 677 F.2d 264, 269 (2d Cir. 1982) (collecting cases).  Accordingly, some courts have held that the Enmons defense is based upon the particular legislative history of the Hobbs Act and does not apply to offenses under other statutes.  See United States v. Thordarson, 646 F.2d 1323, 1329-31 (9th Cir. 1981); MHC, Inc. v. International Union, United Mine Workers of America, 685 F. Supp. 1370, 1379-80 (E.D. Ky. 1988); United States v. Chambers, 515 F. Supp. 1, 3 (N.D. Ohio 1981).


There is even greater reason not to apply the Enmons defense to state law violations involving the use, or threat, of violence, as alleged here, because the Supreme Court in Enmons precluded the Hobbs Act's application to violence used to achieve legitimate

labor objectives, in part, so as not to intrude upon the states' authority to prosecute such acts of violence. See Enmons, 410 U.S. at 411-12. Thus, Enmons itself dispels its application to state law violations involving violence, as alleged here. Accord Thordarson, 646 F.2d at 1329.

Moreover, in closely related contexts, the Supreme Court has repeatedly ruled that states have compelling interests in protecting society from the use, and threats, of violence, as alleged here, and accordingly has held that "[n]othing in the federal labor statutes protects or immunizes from state action violence or the threat of violence in a labor dispute." Farmer v. United Broth. of Carpenters and Joiners of America, Local 25, 430 U.S. 290, 299, 301 (1977) (holding that the National Relations Labor Act ["NLRA"] did not preclude a tort action under state law against a union and it officials to recover damages arising from the defendants' use of threats and intimidation).[5] Similarly, in

_____

[5] Accord Sears, Roebuck & Co. v. San Diego Dist. Council of Carpenters, 436 U.S. 180 (1978) (NLRA did not preclude state injunction to enjoin tresspassory picketing undertaken to induce an employer to use only union members dispatched from the union hiring hall); International Union, United Automobile Workers, *et al.*, v. Russell, 356 U.S. 634, 636 (1958) (NLRA did not preclude a tort action under state law to recover damages from a labor union and its agents arising from the union's strike and picketing which involved "threats of bodily harm to [the plaintiff] and of damage to his property"); Youngdahl v. Rainfair, Inc., 355 U.S. 131, 132 (1957) (NLRA did not preclude a state court from enjoining "strikers and union representatives from. . . threatening, intimidating or coercing any of the officers, agents or employees

<u>Auto Workers v. Wisconsin Board</u>, 351 U.S. 266, 268 (1956), the
Supreme Court recognized that "a state may punish violence arising
in labor relation controversies under its generally applicable
criminal statutes" even if the violent conduct constitutes an
unfair labor practice under federal law. The Supreme Court added:

> [Federal labor laws do] not take from the States power to
> prevent mass picketing violence, and overt threats of
> violence. The dominant interest of the state in
> preventing violence and property damage cannot be
> questioned. It is a matter of genuine local concern.
> Nor should the fact that a union commits a federal unfair

---

of the employer at any place, and also from obstructing, or
attempting to obstruct the free use of the streets adjacent to the
employeers' place of business, and the free ingress and egress and
from the employer's property," which activities were undertaken to
compel the employer to recognize the union) (internal quotations
and brackets omitted); <u>United Construction Workers, et al. v.
Laburnum Const. Corp.</u>, 347 U.S. 656, 665 (1954) (Labor Management
Relations Act of 1947 did not preclude a state tort action against
several labor unions for damages arising from the unions' use of
threats of violence to induce an employer to recognize the unions
and to employ union members, which compelled the employer to
abandon all its projects in the area. The Court added that **"there
is no ground for concluding that existing criminal penalties or
liabilities for tortious conduct have been eliminated"** (emphasis
added)); <u>Allen-Bradley Local 1111, et al. v. Wisconsin Employment
Relations Board</u>, 315 U.S. 740, 748-49 (1942) (Federal law did not
preclude state from enjoining a labor union and its members and
representatives from engaging in picketing involving threats of
violence and obstruction of employer's entrances. **"The Court added
that the NLRA "was not designed to preclude states from enacting
legislation limited to the prohibition or regulation of this type
of employee or union activity. . . we will not lightly infer that
Congress by the mere passage of a federal law has impaired the
traditional sovereignty of the several states in [exercising their
police power]"** (emphasis added)).

labor practice while engaging in violent conduct prevent
states from taking steps to stop the violence.

Id. at 274 (footnote deleted).


These cases make clear that nothing in Enmons or federal labor
laws prevent a state from applying its criminal laws to the use,
and threats, of violence by unions and its representatives in a
labor dispute, as alleged here.  Therefore, whether the state law
violations involving the use, and threats, of violence alleged in
this case are precluded as a matter of law by a claim of right
defense depends on state law, to which we now turn our analysis.


Racketeering Acts One through Ten charge attempted extortion
under New York Penal Law §§ 155.05(2)(e)(i) and (ii), 155.40,
110.00, 110.05 and 20.00.  Racketeering Act 11 charges a conspiracy
to commit and extortion under New York Penal Law §§ 155.05(2)(e)(i)
and (ii), 155.40.  New York Penal Law § 155.05 (2)(e)(i) and (ii),
makes it a crime to commit larceny by extortion as follows:


§ 155.05 Larceny; defined


***


2.   Larceny includes a wrongful taking, obtaining or
     withholding of another's property, with the intent

-41-

prescribed in subdivision one of this section, committed in any of the following ways:

\*\*\*

(e) By extortion.

A person obtains property by extortion when he compels or induces another person to deliver such property to himself or to a third person by means of instilling in him a fear that, if the property is not so delivered, the actor or another will:

(i) Cause physical injury to some person in the future; or

(ii) Cause damage to property; or

\*\*\*

(vi) Cause a strike, boycott or other collective labor group action injurious to some person's business; except that such a threat shall not be deemed extortion when the property is demanded or received for the benefit of the group in whose interest the actor purports to act . . .; or[6]

\*\*\*

New York Penal Law § 155.15, also adopted in 1965, codifies the affirmative defenses to larceny offenses, including larceny by extortion as follows:

§ 155.15 Larceny; defenses

1.  In any prosecution for larceny committed by trespassory taking or embezzlement, it is an affirmative defense that the property was appropriated under a claim of right made in good faith.

---

[6] Under New York Penal Law § 155.40, larceny by extortion is a class C felony.

2. In any prosecution for larceny by extortion committed by instilling in the victim a fear that he or another person would be charged with a crime, it is an affirmative defense that the defendant reasonably believed the threatened charge to be true and that his sole purpose was to compel or induce the victim to take reasonable action to make good the wrong which was the subject of such threatened charge.

It is particularly significant that the "claim of right" defense set forth above applies by its explicit terms **only** to "larceny committed by trespassory taking or embezzlement" and does not apply to larceny by extortion under New York Penal Law § 155.05 (2)(e)(i) or (ii), as charged here. It is also noteworthy that the exception from extortion under Section 155.05(2)(e)(vi) "when the property is demanded or received for the benefit of the group in whose interest the actor purports to act" by its explicit terms applies **only** to threats to "cause a strike, boycott, or other collective labor group action injurious to some person's business," and does not apply to extortions involving the actual or threatened use of violence or force to "cause physical injury" or "cause damage to property" under Section 155.05(2)(e)(i) and (ii), as alleged here.

Moreover, it is a well-established canon of statutory construction that "where [a legislature] includes particular language in one section of a statute but omits it in another

section of the same Act, it is generally presumed that [the legislature] acts intentionally and purposely in the disparate inclusion or exclusion." <u>Russello v. United States</u>, 464 U.S. 16, 23 (1983); <u>accord</u> <u>Gozlon-Peretz v. United States</u>, 498 U.S. 395, 404 (1991). Therefore, it must be presumed that the New York legislature intentionally decided not to apply a claim of right defense to larceny by extortion, as charged here, when it explicitly applied that affirmative defense to another section of the same statute — larceny committed by "trespassory taking or embezzlement" — but did not apply it to the larceny by extortion section. Likewise, it must be presumed that the New York legislature intentionally decided not apply the exception from extortion under Section 155.05(2)(e)(vi) for threats to "cause a strike, boycott, or other collective labor group action" to extortions under Section 155.05(2)(e)(i) and (ii), as charged here, when it applied that exception **only** to extortion under Section 155.05(2)(e)(vi), but did not apply it to extortion under Sections 155.05(2)(e)(i), and (ii).

In accordance with these principles, New York Courts have limited the "claim of right" defense to the explicit, narrow terms of New York Penal Law § 155.05, and accordingly have held that the defense does not apply to extortions involving the use of actual or threatened violence. In <u>People v. Reid</u>, 69 N.Y.2d 469, 476, 515

N.Y.S.2d 750, 752-53 (N.Y. 1987), the New York Court of Appeals held that the claim of right defense does not apply to "crimes involving force," such as the extortion offenses alleged here.  The Court stated:

> The claim of right defense is found in the larceny article of the Penal Law, which provides that a good-faith claim of right is a defense to trespassory larceny or embezzlement (see, Penal Law § 155.15[1]).  The defense does not apply to all forms of larceny.  For example, extortion is a form of larceny, but the Legislature, consistent with a prior decision of this court, has not authorized a claim of right defense to extortion (see, People v. Fichtner, 281 App. Div. 159, 118 N.Y.S. 2d 159 affd. 305 N.Y. 864, 114 N.E. 2d 212).  The exception is significant for extortion entails the threat of actual or potential force or some form of coercion.  Thus, the inference may reasonably be drawn that in failing to authorize a claim of right defense for extortion in Penal Law § 155.15(1), and by failing to incorporate it in article 160 of the statute, which governs robbery, the Legislature recognized that an accused should not be permitted to invoke it in crimes involving force.

69 N.Y.2d at 476, 515 N.Y.S.2d at 752-53.

Similarly, in People v. Banks, 55 A.D.2d 795, 389 N.Y.S.2d 664 (3d Dept. 1976), the defendant was convicted of robbery in the first degree under New York Penal Law § 160.15 and the lesser included offense of grand larceny in the third degree under New York Penal Law § 155.30, based upon his threatening the victim with a gun to collect a debt.  The Banks Court rejected the defendant's

claim that the jury should have been instructed on his affirmative

defense that "the property was appropriated under a claim of right

made in good faith" under New York Penal Law § 155.15.  The Court

stated:

> The peril to the victim and, therefore, to society is
> clearly greater when violence is used, or threatened to
> be used, in the commission of a crime.  The Legislature
> has apparently recognized this distinction in limiting
> the use of the affirmative defense that the property was
> taken under a claim of right made in good faith', by the
> plain terms of subdivision 1 of Section 155.15 of the
> Penal Law, to 'larceny' [by trespassory taking or
> embezzlement] and not robbery.  We see no reason to
> expand the doctrine of self-help to allow it to be
> interposed as a defense by a person who has used actual
> or potential violence.

Banks, 55 A.D. 2d at 796, 389 N.Y.S. 2d at 666.[7]

The rationale of these cases applies with even greater force

in this case.  The Indictment alleges that the Local 17 defendants

engaged in an extensive pattern of violent conduct to extort

property from numerous victims, which posed substantial peril to

---

[7] Accord People v. Knowles, 42 A.D. 3d 662, 664 (3d Dept. 2007)
(claim of right is not a defense to robbery); People v. Green 11
A.D. 3d 559 (2d Dept. 2004) (same); People v. O'Hanlon, 252 A.D.2d
670, 672, 675 N.Y.S.2d 404, 406 (3d Dept. 1998); People v. Coates,
64 A.D.2d 1, 10, 407 N.Y.S.2d 866, 871 (2d Dept. 1978) ("this
defense [Penal Law § 155.15] should not be given a broad
interpretation and should not be extended to a prosecution for
robbery.  **Thus, any alleged claim of right is entirely irrelevant
when the larceny has been accomplished by the use of, or immediate
threat of the use of, physical force**" (emphasis added)); People v.
Hodges, 113 A.D.2d 514, 518, 496 N.Y.S.2d 771, 774 (2d Dept. 1985)
(same).

the victims and society.  Therefore, paramount considerations of public safety compel limiting the affirmative defenses of New York Penal law §§ 155.15 and 155.05(2)(e)(vi) to their explicit terms, consistent with New York case law, and hence they do not apply to the state extortion charges alleged here.  As the Court recognized in Banks, it is one thing to allow a defense of a claim of right to non-violent conduct involving a trespassory taking, or peaceful picketing or boycott; but it is not sound policy to expand such a defense to immunize "a person who has used actual or potential violence," as alleged here.  Banks, 55 A.D.2d at 796, 389 N.Y.S.2d at 666.  Another New York court has perceptively stated that a claim of right is not a defense to a crime involving violence because "it is utterly incompatible with and has no place in an ordered and orderly society such as ours, which eschews self-help through violence.  Adoption of the proposition would be but one step short of accepting lawless reprisal as an appropriate means of redressing grievances, real or fancied."  People v. Hodges, 113 A.D.2d 514, 518, 496 N.Y.S.2d 771, 774 (2d Dept. 1985) (citations and internal quotations omitted).

Based on principles of statutory construction and the applicable New York case law, there is no justification for this Court to expand the defenses codified under New York Penal Law §§ 155.05(2)(e)(vi) and 155.15 beyond their explicit terms to cover

-47-

the violent conduct alleged in this case, which conduct plainly falls outside the scope of these defenses under New York law.

In any event, assuming _arguendo_ that any of the defenses under New York Penal Law §§ 155.05(2)(e)(vi) and 155.15 apply here, the defendants are not entitled to dismissal of the Indictment prior to trial. Rather, at most, the defendants would be entitled to a jury instruction on these defenses if, and only if, they are supported by sufficient evidence adduced at trial. The issues raised by the defendants are factual in origin and, therefore, cannot be resolved short of a trial on the merits.

In sum, this Court should deny the defendants' motion to dismiss because, under the circumstances in this case, the defendants — in using violence and threats of violence to attempt to obtain wages for superfluous labor — were not seeking to achieve legitimate labor union objectives. In any event, the _Enmons_ issues raised by the defendants necessarily require an examination of the facts in this case and, therefore, are not capable of being resolved without a trial on the merits. _See_ Fed. R. Cr. P. 12(b)(2); _Covington_, 395 U.S. at 60.

## THE INDICTMENT DOES NOT CONTAIN GENERIC TERMS

The defendant, Kirsch, contends that the alleged objectives contained in the indictment are legitimate union objectives. Assuming that some of the objectives alleged may encompass the pursuit of illegitimate objectives, defendant argues that since both legitimate and illegitimate goals may be alleged, the objectives are impermissible generic terms "which fail to fairly inform the defense of the nature of the charges." Accordingly, the defendant seeks dismissal of the indictment.

In reliance of his position, the defendant cites the Supreme Court case of United States v. Cruikshank, 92 U.S. 542, 558 (1875). That case held that:

> "It is an elementary principle of criminal pleadings that where the definition of an offense, whether it be at common law or by statute, including generic terms, it is not sufficient that the indictment shall charge the offenses in the same generic terms as in the definition; but it must state the specifics, it must descend to particulars."

United States v. Cruikshank, 92 U.S. at 558.

In that case, certain counts (5 and 13) charged the intent element "to hinder and prevent the parties in their respective free exercise and enjoyment of the rights, privileges and immunities and

protection granted and secured to them respectively as citizens of the United States." and in the 8th and 16th counts "to hinder and prevent [the victims] in the several and respective free exercise and enjoyment of every, each, all and singular, the several rights and privileges granted and secured to them by the Constitution and laws of the United States." _Cruikshank_, 92 U.S. at 557.  The Court found that the indictment merely repeated the statute and that "there is no specification of any particular right." _Id._  It also noted that "facts are to be stated, not conclusions of law alone." _Id._  Because the statute charged included generic terms, it was insufficient that the indictment alleged the offense in the same generic terms as in the definition.  Accordingly, the indictment was invalid.  _Id._, at 558.

In the present case, defendants are charged with RICO conspiracy, conspiracy to commit extortion and attempted extortion. The RICO conspiracy count alleges acts of racketeering which include extortion.  Assuming that the government must allege more than generic terms of extortion in the RICO conspiracy count and the extortion conspiracy count (as opposed to simply alleged and specifying the elements of the conspiracy, that is, the nature of an agreement to commit a crime and the defendants knowing joining the agreement), the government has done so.  Extortion includes the obtaining of "property." _See_, 18 U.S.C. 1951.  Had the indictment

merely alleged an attempt to obtain "property" and solely relied on that generic term, then an argument could conceivably be made that there was a failure to specify a generic term. But that is not the case here.

Instead of simply alleging that the defendants sought "property", the indictment then proceeds to "descend to particulars." That is, the indictment alleges that the defendants sought to obtain four specific types of property:

1.  Wages and benefits to be paid pursuant to labor contracts;

2.  Jobs being performed by non-union laborers and the wages and benefits associated with those jobs;

3.  The right to make business decisions free from outside pressure at construction projects; and

4.  Wages and employee benefit contributions paid or to be paid by said contractors by unwanted, unnecessary and superfluous labor.

Clearly, the indictment did not just repeat the statute and fail to specify this element.

Defendant's reliance <u>United States v. Pirro</u>, 212 F.3d 86 (2d Cir. 2000) fares no better. The defective indictment in that case alleged a crime that depended on a violation of another statute,

but failed to identify the underlying offense. <u>Pirro</u>, 212 F.3d at 93-94 ("The indictment failed to sufficiently allege the second element of a Section 7206(1) violation, namely a material falsehood or an omission that amounted to a material falsehood.") Here, all elements of the underlying offense, if indeed, a conspiracy depends upon a violation of the underlying offense of extortion, have been identified and pled in non-generic terms.

Moreover, no case has been found that requires the government to plead the non-legitimate union objective other than the term "wrongfully" as described in <u>Enmons</u>. However, in an analogous case, <u>Reyes v. Ernst and Young</u>,570 U.S. 170 (1993), the Supreme Court, in examining the RICO statute, 18 U.S.C. 1962, found that "participation in the conduct of affairs of the enterprise required that participation meant involvement in the management and operation of the enterprise's affairs, <u>Reyes</u>, 570 U.S. at 179.

Subsequently, motions to dismiss have been brought for failure to allege involvement in the management and supervision of the enterprise. Those motions have been denied on the basis that the motion goes to the adequacy of proof upon which the indictment is based rather than facial validity of the indictment. Thus, while the motion is appropriate pursuant to Fed.R.Crim.P. 29, it must await proof by the government at trial. <u>See</u>, <u>United States v.</u>

Fruchter, 104 F.Supp. 2d 289, 297-98 (S.D.N.Y. 2000) (argument goes to sufficiency of evidence, not adequacy of the indictment); United States v. Elson, 968 F.Supp. 900, 905 (S.D.N.Y. 1987) ("Government required to demonstrate sufficiency of its proof until the close of its case in chief."); United States v. Trusmych Capital Group, Inc., 260 F.Supp. 2d 444, 455 (D.C. Conn. 2003) (Reves did not hold that the indictment must allege such operation and management").

Just as in Reves, the fact that Enmons held that a legitimate union objective during a strike removes the actions of the strikers from the Hobbs Act, Enmons does not require the government to allege in an extortion conspiracy anything other than the defendants acted "wrongfully." It does not require the government to allege what the non-union objective was. This, the government has done.

### B. FIRST AMENDMENT CLAIMS

The defendant Bove requests that the Indictment be dismissed on a number of grounds premised on violations of the First Amendment Free Speech clause including the contention that the Indictment is facially insufficient. More specifically, the defendant claims that the distinct acts attributable to the defendant Bove "consist entirely of protected speech." Moreover,

"not only do the acts include 'pure speech', they also reflect 'speech that is expressly protected because it involves labor organization [sic]'." (Mahoney Motion at ¶ 15, p. 6. The defendant Bove additionally maintains that "The determination of the constitutionality of applying the statute to the defendant must be determined pretrial." Id. at ¶ 17, p. 7. Finally, the defendant states that the burden of proving that the speech is unprotected and outside of the First Amendment lies with the prosecution and demands a higher standard of proof. Id. at ¶ 18, p. 7.


1.    Pre-Trial Hearing


The defendant Bove asserts that because defendant's First Amendment rights may be violated at trial, determination of this issue should be made pretrial. (Mahoney Motion at ¶ 17, p. 7. The defendant relies on Dombrowski v. Pfister, 380 U.S. 479 (1965), for this proposition. In Dombrowski, the Supreme Court determined that the plaintiffs had standing to challenge the constitutionality of Louisiana's Subversive Activities and Communist Control law in the midst of a criminal prosecution because the government exploited the statute for improper purposes, and mainly to target and harass the plaintiffs. Id. at 482. The plaintiffs offered to show that the prosecution threatened to enforce the statutes without any

expectation of securing valid convictions, and that despite a summary vacatur of search and arrest warrants by a state judge for lack of probable cause, the prosecution was continuing to threaten new indictments and prosecutions which were based on evidence suppressed by the state judge. Also, it was alleged that the prosecution was engaging in a plan of arrests, seizures and threats of prosecution for the sole purpose of harassing plaintiffs. The Supreme Court observed that:

> [a] criminal prosecution under statute regulating expression usually involves imponderables and contingencies that themselves may inhibit the full exercise of First Amendment freedoms . . . Because of the sensitive nature of constitutionally protected expression, we have not required that all of those subject to overbroad regulations risk prosecution to test their rights . . . We have this exception to the usual rules governing standing because of the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute of sweeping and improper application . . . By permitting determination of the invalidity of these statutes without regard to the permissibility of some regulation on the facts of particular cases, we have, in effect, avoided making vindication of freedom of expression, await the outcome of protected litigation."

Dombrowski v. Pfister, 380 U.S. 479, 486-87 (1965).

Subsequently, in Younger v. Harris, 401 U.S. 37 (1971), the Supreme Court reexamined the principles governing federal judicial intervention in pending state criminal cases. The Court declared that federal restraint of state prosecutions is permissible only if the state defendant establishes "great and immediate" irreparable

injury, beyond "that incidental to every criminal proceeding brought lawfully and in good faith." <u>Younger</u>, 401 U.S. at 46. The Court did, however, acknowledge that immediate federal injunctive relief might be obtained in the prospect of extraordinary circumstances such as cases brought in bad faith, harassing police and prosecutorial actions pursued without "any expectation of securing valid convictions." <u>Id.</u> at 48. The Court allowed that there may be other "extraordinary circumstances in which the necessary irreparable injury can be shown even in the absence of the usual prerequisites of bad faith and harassment," for example, where a statute is "flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it." <u>Id.</u> at 53-54. In sum, the <u>Younger</u> Court determined that federal courts must refrain from interfering with ongoing state criminal proceedings that afford plaintiffs an adequate opportunity to raise constitutional claims asserted, unless extraordinary circumstances exist that would create an exception to this rule of abstention. <u>Younger v. Harris</u>, 41 U.S. at 45-49.

From a perusal of <u>Dombrowski</u> and <u>Younger</u>, it is readily apparent that those cases and their progeny do not stand for the proposition that anytime a First Amendment claim is raised, a

defendant is entitled to a pretrial hearing.  Indeed, <u>Younger</u> found that there is ordinarily no irreparable injury if the threat to plaintiff' federally protective rights can be eliminated by the defense of a single criminal prosecution and "even irreparable injury is insufficient unless it is 'both great and immediate.'" <u>Younger</u>, 401 U.S. at 46.  In a major change from <u>Dombrowski</u>, the <u>Younger</u> court said that the possibility of a "chilling effect" on First Amendment freedoms does not itself justify federal intervention.  <u>Younger</u> 401 U.S. at 50-52.  Thus, defendant's request for a pretrial hearing does not find support in Supreme Court jurisprudence.  Moreover, defendant's contention that the prosecution has the burden to establish that First Amendment rights will not be violated is belied by <u>Younger</u>.


In <u>United States v. Carrier</u>, 672 F.2d 300 (2d Cir. 1982), the defendant was charged with a violation of 18 U.S.C. § 871(a) (making a threat upon the President of the United States).  The district court dismissed the indictment because it failed to allege the "factual context in which the actions of the defendant occurred." <u>Carrier</u>, 672 F.2d at 301.  With respect to the issue of whether or not a motion to dismiss alleging a First Amendment issue should be heard pretrial, the Second Circuit stated:


Whether the words spoken by defendant constitute threats
within the proscription of 18 U.S.C. § 871(a) may not be

> decided as a matter of law in this case.  Even assuming
> the sufficiency of the indictment, the district court
> concluded that it must be dismissed as a matter of law
> because the threatening words could not, under any
> circumstances, constitute the kind of threat made
> criminal under § 871(a).  The history and purpose of the
> statute, along with the precedents which have interpreted
> it, bring us to a different conclusion.  In our view, the
> defendant's intention when uttering these words and the
> circumstances surrounding their use, present issues of
> fact to be tried by the jury.

Carrier, 672 F.2d at 304.  Accord, United States v. Davila, 461

F.3d 298, 304 (2d Cir. 2006) (whether a "given writing constitutes

a threat is an issue of fact for the trial jury.") (Citing, United

States v. Malik, 16 F.3d 45 (2d Cir. 1994).  United States v.

Syring, 522 F.Supp. 2d 125, 134 (D.C. 2007) ("whether defendant's

communications constituted a true threat is an issue properly left

to the jury as a trier of facts."); United States v. Viefhaus, 168

F.3d 392, 397 (10th Cir. 1999) ("whether a communication constitutes

a true threat rather than protected political speech is a question

we generally leave for the jury."); United States v. Amor, 24 F.3d

432, 436 (2d Cir. 1994) ("'whether the statements made in the acts

engaged in amount to threatening conduct is a question of fact for

the jury."') (citing United States v. Paradis, 802 F.2d 553, 563

(1st Cir. 1986); United States v. Wolff, 2010 WL 1049569 (10th Cir.

2010) (same).

## 2. FIRST AMENDMENT AND CRIMINAL ACTIVITY

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech," See, U.S. Const. Amend. 1. This First Amendment protection however has not been deemed by the Supreme Court as a "absolute". Konisberg v. State Bar of Cal., 366 U.S. 36, 49 (1961); Dennis v. United States, 341 U.S. 494, 508 (1951). Qualification is necessary because speech may lead to conduct endangering the public's safety and welfare. An individual's right to freedom of expression has been circumscribed, therefore by the government's interest in maintaining law and order. Accordingly, there are some categories of speech that are unprotected because they are "of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in _order and morality." R.A.V.. v. St. Paul, 505 U.S. 377, 382 (1992). "From 1791 to the present, however, the First Amendment has "permitted restrictions upon the content of speech in a few limited areas, and has never included the freedom to disregard these traditional limitations." R.A.V. v. St. Paul, 505 U.S. at 382-83 (1992).

> 'These "historic and traditional categories long familiar to the bar, Simon V. Schuster, Inc. v. Members of N.Y. State Crime Victims Bd., 502 U.S. 105, 127 (1991) (Kennedy, J., concurring in judgment) - including obscenity, Roth v. United States, 354 U.S. 376, 383 (1957), defamation, Bauharnais v.

> _Illinois_, 343 U.S. 250, 254-55 (1952), fraud,
> _Virginia Bd. of Pharmacy v. Virginia Citizens_
> _Consumer Counsel, Inc._, 425 U.S. 748, 771
> (1976), incitement, _Brandeburg v. Ohio_, 395
> U.S. 444, 447, 449 (1969) (per curiam), and
> _speech integral to criminal conduct_, _Giboney_
> _v. Empire Storage and Ice Co._, 36 U.S. 490,
> 498 (1949) - are "well defined and narrowly
> limited classes of speech, the prevention and
> punishment of which have never been thought to
> raise any Constitutional problem."'

_Chaplinsky v. New Hampshire_, 315 U.S. 568, 571-572, 1942; _United_

_States v. Stevens_, 130 Sup.Ct. 1577, 1584, 2010.


In _Giboney v. Empire Storage and Ice Company_, 336 U.S. 690

(1949), a labor union was enjoined from picketing pursuant to the

State's anti-trade restraint law.  It was contended by the union

that the injunction against picketing was an unconstitutional

abridgement of free speech "because the picketers were attempting

peacefully to publicize truthful facts about a labor dispute", 336

U.S. at 497-98.  The Court, however, noted that the publicizing by

the union was not to be treated "in isolation".  _Id._, at 498.

Instead, the Court found that the sole immediate object of the

publicizing was to compel the plaintiff to agree to stop selling

ice to non-union peddlars.  _Id._ at 498.


> The Court found that "all of appellant's
> activities – their powerful transportation
> combination,     their    patrolling,    their
> formation of a picket line, warning union men
> not   to   cross   at   peril   of   their   union

-60-

membership, their publicizing – constituted a single and integrated course of conduct, which was in violation of Missouri's valid law. In this situation, the injunction did no more than enjoin an offense against Missouri law, a felony. It rarely has been suggested that the constitutional freedom of speech extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute. We reject the contention now.

Id., at 498. Other courts have similarly so held.


As stated in <u>United States v. Gilbert</u>, 813 F.2d 1523, 1529 (9th Cir. 1987), "an illegal course of conduct is not protected by the First Amendment merely because the conduct was in part carried out by language in contrast to direct action." If conduct contains both speech and non-speech elements, and if Congress has the authority to regulate the non-speech conduct, incidental restrictions on freedom of speech are not constitutionally invalid. Id. at 1529. (Citing <u>United States v. O'Brien</u>, 391 U.S. 367, 376 (1968); <u>United States v. Cooper</u>, 606 F.2d 96, 98 (5th Cir. 1979)).


The Fifth Circuit Court of Appeals in <u>Shackelford v. Shirley</u>, 948 F.2d 935 (5th Cir. 1991), where the defendant was convicted of violating the state telephone harassment statute and argued that his conviction was in violation of his First Amendment rights, the Court stated in response "as speech strays further from the values of persuasion, dialogue and free exchange of ideas the First

Amendment was designed to protect, and moves towards threats made with specific intent to perform illegal acts, the state has greater latitude to enact statutes that effectively neutralize verbal expression. 948 F.2d 938 (citing Watts v. United States, 394 U.S. 705 (1969) (holding facially constitutional federal statute prohibiting making threats to take the life or inflict bodily harm on the President of the United States)); United States v. Hull, 719 F.2d 1258, 1260 (5th Cir. 1983) (distinguishing between "advocacy" protected by Brandeburg test and unprotected threats)).

In United States v. McDermott, 822 F.Supp. 582 (N.D. Iowa, 1993), the defendants were accused of threatening African American citizens in order to prevent them from enjoying use of a public park. Id., at 593-94. In response to the motion to dismiss by the defendants as violative of the First Amendment, the Court recognized that there were certain categories of speech which were not entitled to First Amendment protection including obscenity, defamation, fighting words, advocacy of imminent lawless action. The Court also noted that "of particular relevance of this case, some argue that "threats" of violence is another category of unprotected speech. McDermot, 822 F.Supp. at 586. (citing Watts v. U.S., 394 U.S. at 705.).

Of particular note is that the two main charges, that is, Counts 1 and 2, are conspiracy counts.  As a result, defendant Bove's argument that they are violative of the First Amendment is less sustainable.  In <u>United States v. Al-Arian</u>, 304 F.Supp.2d, 1322, 1342 (MD Fl. 2004), the defendants were charged with violations of the Anti-terrorism and Effective Death Penalty Act (AEDPA) and challenged the indictment on First Amendment grounds. In response to the argument that the indictment criminalized "pure speech", the Court responded that "it is well established that the government can use speech to prove elements of crimes such as motive or intent", <u>Al-Arian</u>, 308 F.Supp.2d at 1342 (citing <u>Wisconsin v. Mitchell</u>, 508 U.S. 476, 1993; <u>United States v. Stewart</u>, 65 F.3d 918, 930 (11th Cir. 1995).  Regarding conspiracy, the Court stated communication is the essence of every conspiracy, for only by it can common purpose and concert of action be brought about or be proved . . . "but it has never been deemed an abridgment of freedom on speech . . . merely because the conduct was in part initiated, evidence, or carried out by means of language . . . such an expansive interpretation of the constitutional guarantees of speech and press would make it practically impossible ever to enforce the laws against agreements . . . and conspiracies deemed injurious to society.  <u>Id</u>. at 1342.

Likewise, in United States v. Rowlee, 899 F.2d 1275 (2d Cir. 1990), the defendants were convicted of conspiracy to defraud the IRS. Id., at 1276. The defendants argued against their conviction on the grounds that they were simply exercising their First Amendment right of free speech. Id., at 1277. The Court of Appeals stated "the District Court did not err in instructing the jury that a First Amendment defense was not applicable to the charge of violating the statute, which, the Court said, punishes the act of conspiracy and does not implicate speech. It rarely has been suggested that the constitutional freedom for speech . . . extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute." Rowlee, 899 F.2d at 1278, (citing New York v. Ferber, 458 U.S. 747, 761-62 (1982)).

The appellants in Rowlee were convicted of the act of conspiracy, an act forbidden by Section 371. Their conduct was not protected by the First Amendment merely because, in part, it may have involved the use of language "[w]hen speech" and "non-speech" elements are combined in the same course of conduct. A sufficiently important governmental interest in regulating the non-speech element can justify incidental limitations on First Amendment freedoms. Id., at 1278 (citing United States v. O'Brien, 391 U.S. 367, 376 (1968)).

In <u>United States v. Varani</u>, 435 F.2d 758 (6th Cir. 1970), the defendant was charged with attempting to interfere with the administration of Internal Revenue laws. <u>Id.</u> at 759. In response to the defendant's assertion that the prosecution violated his First Amendment rights, the Court stated "contrary to the apparent logic of appellant's contention, speech is not protected by the First Amendment when it is the very vehicle of the crime itself. E.g., 18 U.S.C. § 1621 (1964) (perjury); 18 U.S.C. §§ 2001-2004 (1964), as amended, (Supp. V, 1959) (bribery); 18 U.S.C. §§ 871-877 (1964, as amended, (Supp. V, 1969) (extortion and threats); 18 U.S.C. §§ 371-372 (1964) (conspiracy)." 435 F.2d at 762.

3. **THE DOCTRINE OF "STRICTISSIMI JURIS" DOES NOT APPLY**

Defendant claims that his alleged acts are "protected speech" and "protected association" relating to union activities, and therefore are insufficient to show complicity in the conspiracy (Mahoney Motion at ¶ 21). He bases this argument on the doctrine of *strictissimi juris*.

*Strictissimi juris* requires a higher standard of proof to prove a conspiracy where a group activity involves "both legal and illegal purposes and conduct, and is within the shadow of the first

amendment." <u>Dellinger</u>, 472 F.2d 340, 392 (7th Cir. 1970) <u>cert. denied</u>, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973).  The doctrine arises from cases that penalize mere membership.  For example, in <u>Scythes v. Wess</u>, 307 F.2d 905, 907 (7th Cir. 1962), a defendant faced deportation for his status as a member of an organization that "advocates or teaches . . . the overthrow by force, violence or other unconstitutional means of the Government of the United States." *Strictissimi juris* is intended to prevent unfair imputation of intent or acts of some members onto other innocent members.  <u>Dellinger</u>, 472 F.2d at 392.  It separates those who use legal means from those who use illegal means to achieve a legitimate end.  <u>Montour</u>, 944 F.2d at 1024.  However, *Strictissimi juris* will not apply where the end is itself illegal.  <u>Id</u>.

As used in the cases cited by the defendant, *strictissimi juris* is a post-conviction standard of review of the sufficiency of evidence.  <u>See</u> <u>Scales v. United States</u>, 367 U.S. 203 (1961); <u>Dennis v. United States</u>, 342 U.S. 494 (1951); <u>United States v. Montour</u>, 944 F.2d 1019 (2nd Cir. 1991); <u>United States v. Dellinger</u>, 472 F.2d 340; <u>United States v. Spock</u>, 416  416 F.2d 165 (1st Cir. 1969); <u>Yoffee v. United States</u>, 153 F.2d 570 (1st Cir. 1946). Notably, the <u>Dellinger</u> court commented on its interpretation of the *strictissimi juris* doctrine:

We do not, however, understand the *strictissimi juris* doctrine as requiring evidence of unlawful intent so compelling that a verdict of not guilty would be perverse. We do not view it as wholly depriving the jury of its customary function in interpreting ambiguous statements in the light of circumstances and choosing among reasonable inferences. In order to convict, a jury must in any event be satisfied beyond a reasonable doubt. The *strictissimi juris* doctrine emphasizes the need for care in analyzing the evidence against a particular defendant in a case of this type, both by the jury in its fact-finding process and by the court in determining whether the evidence is capable of convincing beyond a reasonable doubt.

472 F.2d at 393. Also, <u>People v. Biltsted</u>, 150 Misc.2d 872, 574 N.Y.S.2d 272 (Crim. Ct. 1991), upon which defendant relies, interprets <u>Dellinger</u> to mean that "juries should be instructed regarding the First Amendment tests set forth in Brandenburg, as well as the standard of strict scrutiny to be applied in their evaluation of the facts." <u>Biltsted</u>, 150 Misc.2d at 879. This doctrine is a matter for the jury and for appellate courts reviewing the findings of a jury. As such, *strictissimi juris* is inapplicable to a motion to dismiss.

Even if this Court entertains the notion that the *strictissimi juris* standard applies here, it is inapplicable to defendants. Defendant Bove likens this case to <u>Dellinger</u> where *strictissimi juris* was found to apply. There, the convictions were under the

federal anti-riot act for making speeches with the purpose of inciting a riot. _Id_. at 358. They were acquitted on related conspiracy counts. _Id_. The court found that membership in the group that planned the protests was insufficient to show the intent of any individual to incite a riot. _Id_. At 393. However, the Second Circuit distinguished _Dellinger_ in _United States v. Markiewicz_, 978 F.2d 786 (2nd Cir. 1992), where comments and speeches were alleged to directly further a conspiracy. _Markiewicz_, 978 F.2d at 813. The _Markiewicz_ court noted that defendants not only made speeches, but also participated in public disturbances that included threats. _Id_. The purpose of the conspiracy was to commit violence against and to threaten those who disagreed with the defendants. _Id_. _Strictissimi juris_ did not apply because both the means and ends were illegal. _Id_.; _See also_ _Montour_, 944 F.2d at 1024.


In _United States v. Cerilli_, 603 F.2d 415 (3rd Cir. 1979), defendants, convicted under the Hobbs Act for coercive solicitation of political contributions, contended that since the alleged criminal conduct was "inextricably linked to protected political activity" _strictissimi juris_ required the highest standard of proof to be applied. _Cerilli_, 603 F.2d at 421. However, the court held that the violations of the Hobbs Act were not within the shadow of the First Amendment, thus did not warrant the application of the _strictissimi juris_ doctrine. _Id_. at 422. Defendants were not

indicted for their membership in a political party or personal political preferences. Id. They were indicted because they engaged in illegal activity. Id. The Cerilli court then held that the traditional standard of conspiracy was applicable. Id.

In his attempt to force this doctrine to apply, defendant characterizes the "group" as the union as a whole, and the "end" as the legitimate goal of unionizing jobs. According to defendant, some union members may have used illegal activities as the "means", but defendant Bove only used legal speech and picketing. (Mahoney Motion at ¶ 21). However, this misconstrues the indictment. First, defendant is not just being charged because he is a member of the union as in Dellinger, but for "acts and threats of violence against persons, and sabotage and destruction of property," like Markiewicz. (Indictment p. 4) Instead, defendant is accused of meeting with contractors and threatening them with physical and economic harm if they did not succumb to his demands. As evidence of the criminal nature of his request, before he made his demands, he asked the target of this threats whether they were secretly recording his statmesns. Moreover, after the contractors rejected Bove's demands, picketing commenced and subsequently property was damaged in the amount of approximately $200,000. Second, as indicted, the "group" is not the union as a whole, but subgroup, referred to in the indictment as the "Local 17 Criminal Enterprise", and "association

in fact" which conspired to extort and attempt to extort. (Indictment at p. 2). The illegal extortion was the actual "end." Because the means and end were illegal, the actions of Defendant Bove do not fall within the protections of the *strictissimi juris* doctrine. See Montour, 944 F.2d 1019. Thus, no higher standard of proof is necessary to protect his rights.

Under the traditional standard of conspiracy, participation in a common purpose and plan need not be proven directly, but may be inferred by a "development and collocation of circumstances" Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). In Noto v. United States, 367 U.S. 290, 81 S.Ct. 1517 (1960), defendants were convicted under the membership clause of the Smith Act. Noto, 367 U.S. at 301. There the Communist Party, although advocating violent overthrow of the United States government, was found to be within the protections of the First Amendment because it did not advocate present lawless action. Id. at 297. However one defendant participated in a particular program within that organization which did presently advocate violence. Id. at 299. Participation in the program would be sufficient to show criminal intent of that defendant. Id. (dicta).

Bove was a member of and occupied positions of influence within the Local 17 Criminal Enterprise. (Indictment at p. 4). He was present at union activities where illegal conduct took place. (Indictment at p. 41). Indeed, the indictment identifies the defendant at a picket site on May 29, 2001. At the site, one picketer yelled to an employee of the picketed contractor "Come here and I will rip your fucking head off." The Defendant yelled, you can't come into our area and steal our work." (Indictment at pp. 34-35). He made statements that could be construed as threatening. (Indictment at p. 37 & 40). At the Chaffee Landfill site he met with the contractor and told him that the work had been done by the union and "that was the way it was going to be done." (Indictment at p. 39). Therefore, defendant Bove's actions are sufficient for a jury to infer participation under the traditional conspiracy standards.

Further, participation in a conspiracy may be established by "presence under a particular set of circumstances." See United States v.Locascio, 6 F.3d 924 (2nd Cir. 1993)(quoting United States v. Gordils, 982 F.2d 64, 71 (2nd Cir. 1992), cert. denied, 507 U.S. 1054, 113 S.Ct. 1953 (1993). In Locascio, the defendant argued that he was convicted on his "mere presence" when actions were discussed, which is insufficient to prove participation in a conspiracy. Locascio at 944. However, the court distinguished between "mere

presence" and "presence under a particular set of circumstances". Id. At 944-45. That is, although one's presence in a setting where a conspiracy is being conducted or discussed may not by itself connote participation, presence coupled with extrinsic factors can support such a finding. Id. The circumstances under which one is present may imply involvement. Id. See e.g., United States v. Snow, 462 F.3d 55, 68-69(2nd Cir. 2006)(where defendant was present and participating in drug sales during the time of the alleged conspiracy and was a joint renter of the apartment were the bulk of the paraphernalia and narcotics were discovered supports the jury's conclusion that defendant was a "knowing and intentional" conspirator); United States v. Gotti, 459 F.3d 296, 331-32 (2nd Cir. 2006)(where defendant was not only present when a conspirator issued a threat, but was present earlier when the order to threaten was given and accompanied the person making the threat, the evidence in the indictment was sufficient to show defendant participated in the criminal scheme); United States v. Soto, 959 F.2d 1181, 1185 (2nd Cir. 1992) (where only three men were present in an apartment, and there were three separate crack packaging stations, jury could conclude that each had been working at one crack station, thus evidence was sufficient to show conspiracy to distribute narcotics).

Assuming, _arguendo_, the higher standard of _strictissimi juris_ does apply, the evidence is sufficient to show criminal intent of defendant Bove.

Mr. Bove was not only a member of Local 17, which is a "protected" group. He was also a member of the Local 17 Criminal Enterprise, which engaged in illegal activities to further illegal goals. (Indictment at p. 4). By being present, in a leadership capacity, having represented the union in negotiations, having made threatening statements, with property being destroyed shortly after making his demands, picketing then being conducted by union members with disruption to traffic, threats, the use of metal stars, the running of license plate, his request of whether or not his statements which involved demands and threats to a contractor to use Local 17 members were going to be secretly recorded, all establish sufficient evidence for a jury to find that defendant Bove was complicit in the conspiracy. (Indictment at p. 34). Because the indictment is sufficient to show that defendant Bove was complicit in the conspiracy, it states an offense and defendant's motion to dismiss should be denied on this ground.

### 4. __THE INDICTMENT IS VALID ON ITS FACE AND LEGALLY SUFFICIENT__

In paragraphs 30-33, defendant Bove also argues that, as it pertains to him in particular, the indictment is insufficient on the ground of a "failure of a 'plain, concise, and definite written statement of the essential facts." Fed.R.Crim.P. 7(c)(1). He presents a list of his alleged acts from the indictment and argues that each are "innocuous" and protected by freedoms of speech and expression. He then states that all of the "bad acts" were by other, often unnamed, alleged co-conspirators. According to defendant Bove, because there is no direct evidence presented that he was a member of the conspiracy, and because *strictissimi juris* prevents complicity by inference, the indictment both fails to state an offense and fails to provide the essential facts required for sufficient pleading. He argues that if one considers Defendant Bove's acts alone, they do not satisfy the elements of any crime, therefore, prosecution of such would violate his Sixth Amendment rights. Defendant argues "[o]ne could accept all the facts pleaded *in relation to Mr. Bove* and not have any sense of why he is accused of a crime, or what he would have to disprove in order to ensure his acquittal at a trial." Mahoney Motion, ¶ 33 (emphasis added). Defendant does not cite any law to support his argument. He does site his own compilation of specific acts in the indictment. <u>See</u> Mahoney Motion, ¶ 3 (although he cites it as ¶ 7 when mentioned in ¶31). However, there are allegations against defendant Bove that

are not in this list, including his membership in the criminal enterprise. <u>Compare</u> Mahoney Motion, ¶ 3, <u>with</u> Indictment, p. 2.


As noted, for an indictment to be sufficient, it must contain the elements of the offense charged and fairly inform a defendant of the charges against which he must defend, and also enable him to plead an acquittal or conviction in bar of future prosecutions for the same offense. <u>United States v. Alfonso</u>, 143 F.3d 772, 776 (2nd Cir. 1998). An indictment that tracks the statutory language, and provides approximate dates and places where the alleged conduct occurred, is legally sufficient to warrant a trial on the merits. <u>See</u> <u>United States v. Stavroulakis</u>, 952 F.2d 686, 693 (2nd Cir. 1992).

The government has made a *prima facie* showing of defendant Bove's complicity in the conspiracy above in its argument regarding the applicability of *strictissimi juris*. An indictment in a conspiracy case "need only put the defendants on notice that they are being charged with a conspiracy to commit the underlying offense." <u>United States v. Wydermyer</u>, 51 F.3d 319, 325 (2d Cir.1995). Once a conspiracy is charged, the acts of co-conspirators may be attributed to each other. <u>United States v. Kissel</u>, 218 U.S. 601, 608, 31 S.Ct. 124, 126 (1910). Motive or intent may be proven by the acts or declarations of some of the conspirators in furtherance of the common objective. <u>Wiborg v.</u>

<u>United States</u>, 163 U.S. 632, 657, 658, 16 S.Ct. 1127, 1137, 1197, (1896).  In charging such a conspiracy "certainty, to a common intent, sufficient to identify the offense which the defendants conspired to commit, is all that is necessary." <u>Williamson v. United States</u>, 207 U.S. 425, 447, 28 S.Ct. 163, 171 (1908).  Finally, "the Federal Rules of Criminal Procedure neither requires nor permits that a different rule-one engrafted by judicial construction-should apply where 'free speech' considerations may constitute a defense to the crime charged." <u>United States v. Carrier</u>, 672 F.2d 300, 303 (2nd Cir. 1982).  Therefore, defendant may argue that he had a legitimate reason for his speech, association and activities at trial.  However, there is no special pleading requirement just because necessary elements of conspiracy and extortion charges involve speech and association.

Defendant conveniently ignores much of the evidence when he asserts there is no direct evidence of his involvement in the conspiracy.  He negotiated on behalf of the union in deals with the Chaffee Landfill project.  He made demands on more than one occasion, and if there was any doubt about what he was demanding was illegal, before he made his demands he asked if the contractors were secretly recording the conversation.  After his demands were rejected equipment of the contractors was damaged or destroyed, picketing by Local 17 commenced, metal objects designed to puncture

tires were spread on the Chaffee Landfill driveway, license plates of workers were run by the union. Moreover, defendant Bove considers his specifically alleged acts separate from those of his co-conspirators when he argues that the Indictment lacks the "essential facts." He fails to consider the allegations that he was a member of the conspiracy and the acts of the others are therefore attributable to him. It is sufficient that the indictment states with whom he was conspiring, the objectives of the conspiracy, and overt acts by any co-conspirator. <u>United States v. Monaco</u>, 194 F.3d 381, 386 (2nd Cir. 1999). The indictment alleged defendant Bove to have been part of an "enterprise" referred to as the Local 17 Criminal Enterprise operating from on or about January 1, 1997 to on or about December, 2007. Indictment, p.2. This enterprise is alleged to have shared objectives, which were enumerated. Indictment, p.3. Specifically, defendant Bove was alleged to be "a member of Local 17 who also occupied positions of influence within the Local 17 Criminal Enterprise, including, Vice President and Business Representative from at least 2000 through his retirement in 2004." Indictment, p. 4. "The defendants, as a group, were willing to engage in, among other things, acts and threats of violence against persons, and sabotage and destruction of property on construction projects in Western New York. These criminal acts were perpetrated by the defendants upon a number of victims including persons and business conducting construction projects in

the Western District of New York." Indictment, pp. 4-5. The specific objectives of the Local 17 Criminal Enterprise are stated to be attempts to obtain specific types property by extortion and the means and methods are also stated. Indictment pp. 5-6. Because the indictment states the approximate time, co-conspirators, objectives, acts of defendant Bove and overt acts of co-conspirators, the indictment sufficiently states an offense and the specific facts necessary to put defendant on notice of the crime charged and prepare his defense. <u>Monaco</u>, 194 F.3d at 386. Moreover, the Indictment identifies two specific acts of racketeering in which Defendant Bove committed or agreed to commit. That is, defendant is charged with the attempted extortion of Waste Management and Marcy Excavation in Racketeering Act 3 and with the attempted extortion of H.G. Spicer & Sons, Inc. in Racketeering Act 7. The dates of occurrence are alleged in the Acts, as are the locations. The companies attempted to be extorted are identified. Therefore the indictment is valid on its face as it pertains to the specific acts of Defendant Bove.


    **5.**     <u>**THE STATUTE IS NOT UNCONSTITUTIONAL "AS APPLIED"**</u>

    A)     "The Arbitrary Extension of Criminal Statues to Protected Speech, Association, and Labor Organization Activities"


In paragraphs 35-36, defendant Bove argues that the property alleged to have been extorted is a legitimate union objective and

Defendants were exercising rights granted by the First Amendment and the National Labor Relations Act (hereinafter NLRA) to engage in organized labor activity. Therefore, prosecution of the defendant would be unconstitutional because it would make criminal an exercise of his rights.

As was addressed above in the government's <u>Enmons</u> argument, defendants' actions were outside of the narrow scope of the protections afforded union members.

As for speech, defendant attempts to use the "incitement" doctrine established by <u>Brandenburg v. Ohio</u>, 395 U.S. 444 (1969), to support his contention that he cannot be prosecuted for speech related crimes. However, he fails to consider the "true threat" doctrine established in <u>Watts v. United States</u>, 394 U.S. 705 (1969), during the same court term as <u>Brandenburg</u>. Any words or actions with the purpose of creating fear are outside of the protections of the first amendment. <u>See</u> <u>R.A.V. v. City of St. Paul</u>, 505 U.S. 377 (1992). The indictment includes many instances of threats. <u>See</u> <u>e.g.</u> Indictment, Count 2 ¶ 4 ("Come here and I will rip your fucking head off." "You can't come into our area and steal our work."); Count 2 ¶ 34 ("You're not working here today." "You're gonna get hurt." "Laugh, you fucker, you're gonna be sorry." "You're gonna wish you signed"); Count 2 ¶ 47 ("[A]n Earth Tech employee and

Ecology & Environment employee each received anonymous threatening letters at their homes"); Count 2 ¶ 57 ("a Local 17 picketer told an OSC representative, 'We know where you live. We'll get you at home.'"). Not all threats were by defendant Bove. However, acts of co-conspirators are imputed to him and his words, taken in context, could also be considered threats.

Further, as argued *supra*, speech can be used to show an overt act in furtherance of the conspiracy, even if it is otherwise innocent. <u>United States v. Lanier</u>, 920 F.2d 887, 893 (11th Cir. 1991). Therefore, Defendants argument that he is being prosecuted for speech, association and labor activities is untenable.

    B)    "The ambiguity and overbreadth of 'unwanted, unnecessary and superfluous labor'"

Defendant Bove entitles his final First Amendment argument "the ambiguity and overbreadth of 'unwanted, unnecessary and superfluous labor.'" Mahoney Motion at p. 12. His complaint is that there is no definition provided for "the concept of 'wages and benefits to be paid for unwanted, unnecessary and superfluous labor' as property sought to be unlawfully obtained from businesses." Mahoney Motion at ¶ 37. He asks philosophically if labor pursuant to a CBA is inherently "unwanted, unnecessary and superfluous." "[I]sn't the result of every collective bargaining agreement to some degree an

agreement by the business to something they did not want or did not need - at least because non-union labor might have been found - and involved positions that are considered superfluous, such as safety officers, or stewards, etc., whom the business would not employ if its workers did not come out of the union hall?" Mahoney Motion, ¶ 39. Defendant assumes "[t]he term arises is (sic) a context which assumes that the contractor has agreed to hire union laborers and compensate them in accordance with a collective bargaining agreement, but then recasts the agreement as involving 'unwanted, unnecessary and superfluous labor.'" Mahoney Motion, ¶ 37. He concludes by asking if "unwanted" is enough or does an indictment need to allege the conjunctive of all three adjectives? Mahoney Motion, ¶ 40.

First, "overbreadth" and traditional "ambiguity" arguments are means of challenging the language in a *statute*. See e.g., New York v. Ferber, 458 U.S. 747, 771, 102 S.Ct. 3348, 3362 (1982); United States v. Rahman, 189 F.3d 88, (2nd Cir. 1999). Obviously, these challenges are inapplicable here, where the language occurs not in a statute, but in an indictment.

Second, while a definition was not provided in the indictment, similar language appears in several Hobbs Act cases. See e.g., Enmons, 410 U.S. at 408 (pointing out that the Hobbs Act has been

held to reach instances where unions exacted wage payments from employers in return for "imposed, unwanted, superfluous and fictitious services" of workers); <u>United States v. Robilotto</u>, 828 F.2d 940, 945 (2nd Cir. 1987)(threatening employers into paying for "unwanted, fictitious labor services was clearly 'illegitmate labor activity' not protected by <u>Enmons</u>"); <u>United States v. Green</u>, 350 U.S. 415, 417 (allegation that defendant extorted wages to be paid for "imposed, unwanted, superfluous and fictitious services of laborers").    Here, the Indictment states "a Local 17 member, advised a representative of Amstar of Western New York, a union painting contract, that Local 17 would require a Local 17 member to be hired by Amstar as a stand-by operator of a painting compressor...."  Indictment, Count 2 ¶ 32.    This is clearly an allegation of unwanted, unnecessary and superfluous labor in both the common meaning of the words "unwanted" "unnecessary" and "superfluous" and the meaning used in other Hobbs Act usages.

Finally, his philosophical arguments regarding the nature of labor and CBAs as they apply to "unwanted, unnecessary and superfluous" property were addressed in the government's <u>Enmons</u> argument.  Thus, there is no ambiguity or overbreadth issue with this language as used in the Indictment.  As there are no legitimate First Amendment challenges to the Indictment, Defendant's Motion to Dismiss should be denied on these grounds.

## C.  <u>DUE PROCESS</u>

Defendant Bove argues that because his acts were those of speech and association and anything criminal was within the protections of the "recognition of the 'labor exception' to the Hobbs Act by both Congress and the Supreme Court", he could not have known they were criminal.  Also, because the charged statues fail to give warning that the "garden variety labor organization activities and protected speech and expressive acts in connection therewith" exposed him to criminal liability, they violate his right to due process.  He argues that this makes the statute and its application to Defendant impermissibly vague.

A statute can be void for vagueness where it fails to provide due notice so that 'ordinary people can understand what conduct is prohibited,' or if it may "encourage arbitrary and discriminatory enforcement" <u>Kolender v. Lawson</u>, 461 U.S. 352, 357, 103 S.Ct. 1855 (1983).  Defendant does not state which language he considers vague, and the only specific statute mentioned in this section is "the Hobbs Act" 18 U.S.C. 1951(a).  Mahoney Memorandum of Law p. 23. That statute states:

> (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by

robbery or extortion or attempts or conspires
so to do, or commits or threatens physical
violence to any person or property in
furtherance of a plan or purpose to do anything
in violation of this section shall be fined
under this title or imprisoned not more than
twenty years, or both.

In the instant case, defendants were charged under this statute with conspiring to use extortion to affect commerce. Specifically, a number of union members worked as a criminal enterprise to use fear to extort property from potential employers and their non-union employees. While <u>Enmons</u> created an exception to the Hobbs Act for extortion associated with collective bargaining agreements, as discussed earlier, that exception does not apply here. Defendants' actions were not "garden variety union activities" such as the free expression of political thoughts and ideas, peaceful picketing and the type criminal mischief protected by <u>Enmons</u>. Specific threats were made to non-union employers, non-union employees, and their families. <u>See</u> Indictment, Count 2 ¶¶ 47, 48, 57. People were threatened. Count 2 ¶ 2. Property was destroyed Count 2 ¶¶ 3. All for the purpose of obtaining property from employers and their employees. Indictment, p. 5. The government disagrees that any ordinary person would question whether these acts are prohibited by a law that states "Whoever in any way or degree obstructs, delays, or affects commerce . . . by robbery or extortion or attempts or conspires so to do. . . .." Further, claims that this statute was

facially vague have been rejected. See United States v. Varlack, 225 F.2d 665 (2nd Cir. 1955)(adopting the scope and constitutionality arguments in Bianchi v. United States); see also United States v. Williams, 621 F.2d 123 (5th Cir. 1980)(finding terms of this section were not unconstitutionally vague in that they gave person of ordinary intelligence a reasonable opportunity to know what was prohibited, so that he may act accordingly), rehearing denied, 631 F.2d 732, *certiorari den.* 101 S.Ct. 1366, 450 U.S. 919, 67 L.Ed.2d 346.; United States. v. Rosa, 560 F.2d 149 (3rd Cir. 1977)(finding this section, as interpreted to forbid attempted extortion, was not void for vagueness), *certiorari den.* 434 U.S. 862, 98 S.Ct. 191; Callanan v. United States, 223 F.2d 171 (8th Cir. 1955) (finding that the definition of extortion in this section is not invalid as being too indefinite), *certiorari den.* 76 S.Ct. 102, 350 U.S. 862, 100 L.Ed. 764, rehearing denied 76 S.Ct. 210, 350 U.S. 926, 100 L.Ed. 810; Bianchi v. United States, 219 F.2d 182, (8th Cir. 1955) (Finding that this section does not deny that Fifth Amendment due process on the ground that the word "wrongful" in the extortion definition is too vague and indefinite to provide an actionable standard of guilt ), *certiorari den.* 349 U.S. 915, 75 S.Ct. 604, rehearing denied 349 U.S. 969, 75 S.Ct. 879.

Further, the underlying offenses of extortion and conspiracy have a requirement of scienter. A challenge for vagueness has a

higher standard where there is a requirement of scienter.  <u>Screws v. United States</u>, 325 U.S. 91, 65 S.Ct. 1031 (1945) (rejecting vagueness challenge to what is no 19 U.S.C. § 242 because it had a scienter requirement.)  "When the government must prove intent and knowledge, 'these requirements . . . do [] much to destroy any force in the argument that application of the [statute] would be so unfair that it must be held invalid[.]'" <u>United States v. Cherry</u>, 938 F.2d 748, 754 (7th Cir. 1991) (<u>quoting</u> <u>Kolender v. Lawson</u>, 461 U.S. 352, 357, 103 S.Ct 1855 (1983).

As for the fact that speech and association are integral aspects of these charges, thus the statute is overbroad, defendants' argument also fails.  A statute is unconstitutionally overbroad if "it reaches a substantial number of impermissible applications." <u>New York v. Ferber</u>, 458 U.S. 747, 771, 102 S.Ct. 3348, 3362 (1982).  Invalidating a statue on overbreadth grounds is "strong medicine" that must be applied "sparingly and only as a last resort" <u>Broadrick v. Oklahoma</u>, 413 U.S. 601, 613, 93 S.Ct 2908, 2916 (1973).  While both conspiracy and extortion touch upon protected speech and association, they are not invalid where the purpose of the speech and association are criminal.  <u>See</u> <u>United States v. Spick</u> , 416 F.2d 165, 169-71 (1st Cir. 1969).  As such, the statute does not reach "impermissible applications."

Defendants are charged with more than "garden variety union activities" and they cannot hide behind First Amendment protections. Plenty of union members have been prosecuted for abusing their rights and harming others. See e.g. United States v. Green, 350 U.S. 415 (1956), United States v. Clemente, 640 F.2d 1069 (2nd Cir. 1980), United States v. Varlack, 225 F.2d 665 (2nd Cir. 1955). Therefore, defendants' motion to dismiss on the ground of a violation of due process should be denied.

## CONCLUSION

**WHEREFORE,** based on the foregoing, the government respectfully requests that the Court deny the defendants' motion to dismiss.

DATED:  Buffalo, New York, June 21, 2010.

Respectfully submitted,

WILLIAM J. HOCHUL, JR.
United States Attorney

BY:    *S/ CHARLES B. WYDYSH*
CHARLES B. WYDYSH
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York  14202
716/843-5870
Charles.Wydysh2@usdoj.gov_

BY:    *S/ ANTHONY M. BRUCE*
ANTHONY M. BRUCE
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York  14202
716/843-5886

Anthony.M.Bruce@usdoj.gov


BY:    **_S/ AUDREY HERMAN_**
       AUDREY HERMAN
       Law Clerk
       United States Attorney's Office
       Western District of New York
       138 Delaware Avenue
       Buffalo, New York  14202

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                    v.                                    07-CR-304-S

CARL A. LARSON, *et al.*,

                    Defendants.

---

## CERTIFICATE OF SERVICE

    I hereby certify that on June 21, 2010, I electronically filed the foregoing **GOVERNMENT'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT** with the Clerk of the District Court using its CM/ECF system, which would then electronically notify the following CM/ECF participants on this case:

        Thomas J. Eoannou, Esq.
        John K. Jordan, Esq.
        Cheryl Meyers-Buth, Esq.
        Joseph M. LaTona, Esq.
        Andrew C. LoTempio, Esq.
        Rodney O. Personius, Esq.
        John J. Molloy, Esq.
        Mark J. Mahoney, Esq.
        Kevin W. Spitler, Esq.
        Patrick J. Brown, Esq.
        Mark R. Uba, Esq.
        Joel L. Daniels, Esq.

*S/ JEAN L. BOWMAN*
JEAN L. BOWMAN