UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

**Hon. Hugh B. Scott**

07CR304S

CARL A. LARSON, et al.,

**Report
&
Recommendation**

Defendants.

The instant matter before the Court is defense motions to dismiss the Indictment (Docket Nos. 153, Mark Kirsch, et al., Motion[1]; 155, Gerald Bove Motion[2]; see also Docket No. 158, Caggiano Motion to Join Kirsch motion). Responses to these motions were due on June 28, 2010, with argument initially scheduled for July 12, 2010 (Docket No. 163), but extensions of time were granted to file responding and reply papers (Docket No. 167; see Docket Nos. 161,

---

[1] In support of this motion, defendants submit Kirsch's memorandum in support, Docket No. 154; and reply, Docket No. 180. They also submitted a copy of United States v. McFall, 558 F.3d 951 (9th Cir. 2009), cited by them during oral argument (regarding the role of lenity in construing criminal statutes, id. at 957).
 In opposition, the Government submits its oversized omnibus response, Docket No. 170, see also Docket No. 169, Motion for leave to file excess pages; and sur-reply, Docket No. 182.
 Permission for the Government to file its oversize response and a sur-reply is **granted nunc pro tunc**.

[2] In support of his motion, Bove submits his attorney's affidavit, Docket No. 155; his memorandum of law, Docket No. 156; his reply, Docket No. 181.
 In opposition, the Government also submits its omnibus response, Docket No. 170, and sur-reply, Docket No. 182.

173). These motions were argued on September 15, 2010, and deemed submitted following supplemental briefing (Kirsch's submission of the McFall decision).

While these motions were pending, some of the defendants named have entered guilty pleas (see Docket No. 141, James Minter plea agreement; Docket No. 149, Gerald Franz plea agreement).

BACKGROUND

This is a racketeering conspiracy, Hobbs Act conspiracy, racketeering forfeiture, and aiding and abetting prosecution involving International Union of Operating Engineers, Local 17, AFL-CIO ("Local No. 17"), allegedly operating as a criminal enterprise from about January 1997 to December 2007 (Docket No. 4, Superseding Indictment ¶ 1).

As stated in the Order regarding defendants' motions for Bills of Particular (Docket Nos. 90, Order at 2-3; 108, Order at 2-3), in the Superseding Indictment (hereinafter the "Indictment"), the Government alleges that Local No. 17 functioned as a criminal enterprise from about January 1997 to December 2007 (id. ¶ 1). Most of the defendants[3] are officers and members of Local No. 17 alleged to be part of the "Local 17 Criminal Enterprise," (id. ¶¶ 2-8) with defendants Carl Larson, James Minter, Mark Kirsch, and Gerald Franz allegedly "primary" figures in the Enterprise (id. ¶¶ 2-5). The Indictment alleges that defendants (as a group) were willing to engage in acts and threats of violence against persons, to sabotage and destroy property on construction sites within this District (id. ¶ 9). The alleged objective of the so-called "Local 17 Criminal Enterprise" was extortion by obtaining contracts from construction firms,

---

[3] The first Count does not name Michael Caggiano or Thomas Freedenberg as members of the Enterprise. Caggiano and Freedenberg's roles in the union are not stated in the Indictment.

taking the property of non-union construction laborers in their jobs (with their salaries and benefits) from these non-union shops, depriving contractors of their right to make business decisions free of outside pressure, and "property of construction contractors consisting of wages and employee benefit contributions paid or to be paid by said contractors for unwanted, unnecessary, and superfluous labor" (id. ¶ 10). The Indictment lists various means "among the means and methods by which the defendants and their associates agreed to conduct" the affairs of the criminal enterprise (id. ¶ 11).

The Indictment alleges that defendants conspired to conduct the affairs of the Local 17 Criminal Enterprise through a pattern of racketeering activity (id. ¶ 12), in violation of RICO, 18 U.S.C. § 1962(d). Defendants, "together and with others," conspired to commit at least two acts of racketeering alleging attempts of extortion from different construction contractors in Western New York (id. ¶ 13, Racketeering Acts 1-11), with attempted acts in violation of the Hobbs Act, 18 U.S.C. § 1951(a), or provisions of New York State Penal Law. Different defendants allegedly engaged in, attempted to engage in, and conspired to commit various racketeering acts against different contractors. For example, Racketeering Act One alleges that defendant Larson attempted to extort jobs and associated wages and benefits from STS Construction of Western New York at several construction project locations, "to include, among others" Roswell Park Cancer Institute, the Rath Building, the Buffalo Psychiatric Center, and two other named sites (id., Racketeering Act 1). The other racketeering counts allege attempted extortion from other contractors[4] or conspiracy by Jeffrey Lennon and Kenneth Edbauer to

---

[4]Racketeering Act 2, Zoladz Construction Company; Racketeering Act 3, Waste Management and Marcy Excavating; Racketeering Act 4, Environmental Strategies and Ontario Speciality Contracting; Racketeering Act 5, Ecology & Environment and Earth Tech;

attempt extortion from unspecified construction contractors in violation of the Hobbs Act and New York Penal Law (id., Racketeering Act 11).

Count Two alleges a Hobbs Act conspiracy. The Indictment alleges that one of the overt acts of that conspiracy was an unnamed business agent of Local No. 17 approached an unnamed representative of STS Construction and then harassed that representative when STS refused to sign a collective bargaining agreement with Local No. 17 for construction at Roswell Park (id. at 32-33, Overt Act 1).

The remaining counts allege attempted Hobbs Act extortion against different contractors by different defendants. Count Three alleges attempted Hobbs Act extortion of STS (id. at 53); Count Four of Zoladz Construction Company (id. at 54); Count Five of Waste Management and Marcy Excavation Company by Gerald Bove (id. at 56); Count Six of Ontario Speciality Contracting (id. at 57); Count Seven of Ecology & Environment and Earth Tech (id. at 58); and Count Eight of Wadsworth Golf Construction Company for properties in Orchard Park and Cheektowaga, New York (id. at 59).

The Indictment also alleges a RICO forfeiture claim (id. at 60-61).

At oral argument, counsel for Kirsch and Bove asked that the Court consider the charges leveled against each defendant as well as the overall Indictment. But some general statements can be made from a review of the Indictment. The Indictment charges a conspiracy over a seven-year period, with various contractors for different job sites, where representatives of Local 17 (some named defendants or other, unidentified representatives) approached non-union

---

Racketeering Act 6, Ingalls Site Development; Racketeering Act 7, H.G. Spicer & Sons, Inc.; Racketeering Act 8, C.O. Falter Construction; Racketeering Act 9, Tom Greenauer Development, Inc.; Racketeering Act 10, Wadsworth Golf Construction.

contractors seeking a collective bargaining agreement or project labor agreement. After the contractors refuse to enter into such agreements defendants (and/or others) would harass the contractors. Job sites were then picketed, sometimes with vandalism of the contractor's equipment; license plate numbers of contractor's employees' vehicles were recorded; employees were harassed and intimidated. The Indictment charges that a named defendant would be at a job site, and hours or a few days later there would be an incident of vandalism or other violence. (See generally Docket No. 4, Superseding Indict. Count 2.) Allegedly, some defendants would refer to these incidents in further discussions with the contractors in order to obtain an agreement. For example, Larson and Lennon allegedly referred Zoladz to the damage to its equipment following an incident (id. at 38-39).

Bove, a retired member of the union who allegedly occupied "positions of influence within the Local 17 Criminal Enterprise" (as vice president and business representative) (Docket No. 4, Superseding Indict. ¶ 7, emphasis removed), points out (Docket No. 155, Bove Atty. Affirm. ¶ 3) that he is accused of conspiracy to attempt extortion by saying things on a picket line (Docket No. 4, Superseding Indict. at 34, Count 2 subpara. 4), telling Marcy Excavation that the Chaffee Landfill was a union job site and would remain as such (id. at 39-40, Count 2 subparas. 21-22), hanging up the telephone when Marcy refused (for a second time) to enter into a collective bargaining agreement with Local 17 (id. at 40, Count 2 subpara. 23), speaking with Waste Management about retaining Marcy, a non-union shop, and picketing the Chaffee Landfill (id. at 40, Count 2 subpara. 24). On May 29, 2003, Bove and Peterson and other Local 17 members picketed the Chaffee Landfill (id. at 41, Count 2 subpara. 27). Sharp pieces of metal, called "stars" in the Indictment, then were found at the landfill. The Indictment charges that

5

Local 17 members ran license plate numbers of vehicle at that site. (id., Count 2 subparas. 28-30.)

Alleged against other defendants are similar roles in dealing with other non-union contractors.

*Count 1 Racketeering Acts*

Larson, named in the most counts and four of the racketeering acts for Count 1, was an organizer in Local 17 (Docket No. 4, Superseding Indict. ¶ 2). He allegedly conspired to attempt to extort from STS Construction of Western New York at numerous job sites (Docket No. 4, Superseding Indict. at 10-12, Racketeer Act 1), Zoladz Construction at various job sites (id. at 12-14, Racketeering Act 2, with other defendants), Environmental Strategies and Ontario Specialty Contracting at the former National Fuel site (id. at 17-20, Racketeering Act 4, again with others), and Wadsworth Golf Construction from sites in Orchard Park and Cheektowaga (id. at 27-29, Racketeering Act 10, with Gerald Franz).

Minter was a trustee and organizer in Local 17 (id. ¶ 3). He allegedly conspired to attempt to extort from Zoladz Construction at various job sites (id. at 12-14, Racketeering Act 2, with other defendants), Environmental Strategies and Ontario Specialty Contracting at the former National Fuel site (id. at 17-20, Racketeering Act 4, again with others), and Ecology & Environment and Earth Tech at the Fourth Street site (id. at 20-22, Racketeering Act 5, with others).

Kirsch was president and business manager for Local 17 and held those positions since 1997 (id. ¶ 4). He also allegedly conspired to attempt to extort from Environmental Strategies and Ontario Specialty Contracting at the former National Fuel site (id. at 17-20, Racketeering Act

4, again with others), and Ecology & Environment and Earth Tech at the Fourth Street site (id. at 20-22, Racketeering Act 5, with others), as well as from Tom Greenauer Development, Inc., from the Ralph Wilson Stadium job site (id. at 26-27, Racketeering Act 9).

Franz held various management positions in the union, including trustee, organizer, business representative, and treasurer (id. ¶ 5). He allegedly conspired to attempt to extort from Zoladz, C.O. Falter Construction at the Bird Island Treatment Plant site, and Wadsworth Golf Construction (id. at 12-15, 25-26, 27-29, Racketeering Acts 2, 8, 10).

Peterson also held numerous offices in Local 17 (allegedly "positions of influence" within the Enterprise), serving as guard, organizer, financial secretary, and business representative (id. ¶ 6). He allegedly conspired with others to attempt to extort from Zoladz and Waste Management and Marcy Excavation at the Chaffee Landfill (with Bove) (id. at 12-15, 15-17, Racketeering Acts 2, 3).

Lennon, Edbauer, George Dewald, and Michael Eddy were members of Local 17, but not named in the Indictment as officers of the union (id. ¶8). Lennon and Edbauer conspired to attempt to extort from Ingalls Site Development at the Delaware Avenue job site (id. at 22-23, Racketeering Act 6). Lennon and Edbauer also conspired to commit extortion between January 1997 to December 2007at unspecified construction contractors (id. at 29-31, Racketeering Act 11).

*Count 2 Hobbs Act Conspiracy*

This count gives the overt acts for the conspiracy, as well as examples of the criminal conduct in the racketeering and alleged extortion counts alleged in other parts of the Indictment. Kirsch will be used as an example of the allegations raised by the Government in this count.

7

After Local 17 members allegedly broke a window of a Tom Greenauer Development vehicle and Greenauer (a non-union contractor) was replaced by a union shop, Kirsch stated "we did what we had to do" (id. at 34, Count 2 subpara. 2). On April 2005, Kirsch entered into a Memorandum of Agreement with Wadsworth Golf Construction, which provided that all but one of its operators would be replaced by Local 17 members, with Wadsworth allegedly signing the agreement after members of Local 17 threatened unfair labor practice charges against Wadsworth (id. at 43, Count 2 subpara. 35).

On or about May 9, 2005, Kirsch and Franz met with representative of Ontario Specialty Contracting to discuss the National Fuel site. Kirsch allegedly advised Ontario Specialty that if it did not sign a project labor agreement, Kirsch would shut down the job (id. at 43-44, Count 2 subpara. 36). On July 19, 2005, Kirsch met with the general contractor at the National Fuel site and sought to have Ontario Speciality removed from the project and replaced with a union contractor, with Kirsch not satisfied that a union contractor was performing some of the work (id. at 45-46, Count 2 subpara. 43). On September 22, 2005, Kirsch as Local 17 president signed a Settlement Agreement with the National Labor Relations Board regarding Local 17's actions towards Ontario Speciality on this job site (id. at 50, Count 2 subpara. 64).

On July 20, 2005, Local 17 picketers delayed entry of Earth Tech employees at the Fourth Street Remediation site, gluing the lock on an access gate and placing their own lock on the gate when the glued lock was removed. Kirsch advised Earth Tech representatives that Earth Tech would have to hire all union operators at that job site. (Id. at 46, Count 2 subpara. 44). On September 22, 2005, Kirsch as Local 17 president signed a Settlement Agreement with the

National Labor Relations Board regarding Local 17's actions towards Earth Tech on this job site (id. at 50, Count 2 subpara. 63).

*Counts 3 through 8 Attempted Hobbs Act Extortions*

The remaining counts allege that individual defendants conspired to extort from the contractors identified in racketeering Count 1 and Hobbs Act conspiracy Count 2.

Caggiano allegedly attempted to extort from STS (id. at 53-54, Count 3, with Larson) and conspired to commit a Hobbs Act violation, allegedly by stabbing president of STS Timothy Such in the neck on December 23, 2002, at a restaurant in Orchard Park (id. at 37, Count 2, subpara. 11). On February 7, 2003, a representative of STS was told by a unknown male that "if anything happens to Mike [defendant Caggiano], we're going to get you" (id. at 38, Count 2, subpara. 15). Freedenberg allegedly attempted to extort from Wadsworth Golf Construction (id. at 59-60, Count 8, with Larson and Franz), by calling a representative of Wadsworth in June 2006 and profanely stated that the provision in Wadsworth's agreement (presumably the April 2005 agreement entered into with Kirsch) that allowed it to use its employees on its equipment was meaningless (id. at 52, Count 2, subpara. 73). He also allegedly conspired to commit Hobbs Act violations against STS by informing one of its representative that only two present STS employees would be admitted to the union and that additional employees necessary for work at the General Motors site would come from existing Local 17 members (id. at 41-42, Count 2 subpara. 31), without alleging Freedenberg's role in the union.

*Defense Motions*

Following disposition of defendants' discovery motions (Docket Nos. 61, 67 (Freedenberg), 66 (Lennon), 65 (Dewald), 80 (Eddy), 70 (Peterson), 73 (Kirsch), 74 (Caggiano),

9

75 (Bove), 77 (Larson), 78 (Minter), 84 (Franz), and 81 (Edbauer); Nos. 90, 91, Orders of Mag. J. Scott; 108, Order on reconsideration motion; No. 138, Order of Jan. 25, 2010, of Chief Judge Skretny), a briefing schedule was set for dispositive motions (text minute entry Feb. 5, 2010), with motions due March 5, 2010, the Government's response by March 29, 2010, any replies by April 2, 2010, and argument initially scheduled for April 5, 2010 (id.).

All defendants join in Kirsch's motion to dismiss (Docket No. 153), arguing that, under United States v. Enmons, 410 U.S. 396 (1974), there is no Hobbs Act liability for their legitimate labor activities. Kirsch also argues that the Indictment is impermissibly generic and vague.

Bove also moves to dismiss (Docket No. 155), arguing the facial insufficiency of the Indictment, the fact that the Hobbs Act fails to warn him of possible criminal liability for the acts charged in the Indictment, and that the Hobbs Act is unconstitutional as applied herein.

DISCUSSION

I. Enmons

The Court first considers the Supreme Court's decision in Enmons and its construction of the Hobbs Act in the labor context. The Hobbs Act provides that "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section," 18 U.S.C. § 1951(a), with "extortion" defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear," id. § 1951(b)(2); see Enmons, supra, 410 U.S. at 397.

As noted by Chief Judge Skretny in this case (Docket No. 138, Order ¶ 7),

> "in Enmons, the United States Supreme Court held that unlawful acts during a labor strike aimed at a legitimate labor objective could not be prosecuted under the Hobbs Act. 410 U.S. 396, 401 (1973). Use of force to achieve an illegitimate labor objective, however, may be prosecuted under the Hobbs Act. Id. at 408. Thus, under Enmons, whether a Hobbs Act prosecution is permissible in the labor context turns on the motivation for the alleged unlawful acts."

(Id., emphasis in original.) In that case the district court dismissed the Indictment on defendants' pretrial motion, Enmons, supra, 410 U.S. at 398. Defendants were employees of Gulf States Utilities Company on strike and were members and officials of the union attempting to negotiate a new collective bargaining agreement with the utility, id. at 397. The Court held that the Hobbs Act "did not apply to the use of force to achieve legitimate labor ends," id. at 401, and distinguished legitimate labor ends (higher wages for genuine services, see id. at 400) from illegitimate ones, such as extracting payments to stop a strike, see id. at 406 n.16 (discussing New York Penal Law definition of "extortion," the model for the Hobbs Act), or obtaining wages for "'imposed, unwanted, superfluous and fictitious services of laborers,'" id. at 408 (quoting United States v. Green, 350 U.S. 415, 417 (1956)). The legislative history of the Hobbs Act showed that Congress intended to close a loophole that allowed a union to extract money for superfluous work, id. at 401-06 (discussing legislative history and United States v. Local 807, 315 U.S. 521 (1942); see also Green, supra, 350 U.S. at 418-19. The Enmons Court also held that Congress did not intend a broader construction of the Hobbs Act to extend federal criminal jurisdiction to state criminal activity, 410 U.S. at 410, 411; see also id. at 412 (Blackmun, J., concurring) ("Congress did not intend to exercise its power to reach these acts of violence"), giving examples of the expansive jurisdiction argued by the Government then that the Hobbs Act would cover "the worker who threw a punch on a picket line, or the striker who deflated the tires

11

of his employer's truck," id. at 410, an argument even the Government thought went too far (conceding that an "incidental injury to person or property" exception should be read into the act, id. at 410 n.20). The Court cautioned that the Hobbs Act, as a criminal statute, is to be "strictly construed," id. at 411.

II.  Kirsch's Motion

  A.  Application of Enmons

Kirsch contends that this Indictment must be dismissed pursuant to Enmons (Docket No. 154, Kirsch Memo. at 2-5). As were the defendants in Enmons, Kirsch and the other Local 17 defendants here are charged with conspiring to obtain property, the wages and other things of value from contractors, by unlawful means of physical violence and destruction of property (id. at 2-3). Defendants here argue that they fell within the Enmons recognized labor exception to the Hobbs Act, relying upon the rationale in Enmons that Congress intended the Hobbs Act only to reach extortion or use of force to obtain personal payoffs or obtain imposed, unwanted, superfluous and fictitious services from these contractors, see Enmons, supra, 410 U.S. at 400 (id. at 4). Instead, defendants were pursuing the legitimate union objective of obtaining wages for genuine services (id.). Defendants further argue that the Government needed to allege both wrongful means as well as wrongful objective (unwanted, superfluous services), whereas here defendants contend that their objective was lawful.

The issue here is whether defendants' objective was lawful or not, that is, whether the services they sought to provide were unwanted or superfluous; if they were, then Hobbs Act liability would attach. At this stage of the proceeding, the answer to that question rests upon

12

what is alleged in the Indictment and whether those allegations establish a prima facie case that the services were unwanted or superfluous.

The Indictment, however, does not allege which services defendants offered to provide that would have been unwanted, superfluous or fictitious. The Enmons reference to "unwanted" services is not to cover services refused by a non-union contractor; otherwise, any labor action against a non-union shop once those services are declined would constitute a Hobbs Act violation. The Indictment merely makes the conclusory allegation that defendants' services were superfluous and unwanted. The Indictment does not allege personal payoffs or coerced entry into no-show job agreements, the type that lead Congress to enact the Hobbs Act in reaction to the Local 807 decision, see Enmons, supra, 410 U.S. at 401-08; United States v. Robilotto, 828 F.2d 940 (2d Cir. 1987) (defendants conceded that they furnished superfluous and unwanted services). While discussing instances of the union members contacting contractors, picketing their job sites, or allegedly causing damage or threatening violence, the Indictment does not show the unlawful objective portion of the Hobbs Act by stating the type of jobs and services defendants sought and whether they were in fact bona fide jobs. What is alleged is reluctant contractors being confronted by Local 17 members, leading to job actions and resultant violence and property damages, activity (without more) that Enmons recognizes as lawful, non-extortive labor action. Furthermore, some of the activities are by unnamed or unknown members of Local 17 or others that are being attributed to the named defendants by means of the "Enterprise" (as well as by the conspiracy in the conspiracy counts). On this basis, all defendants' motion to dismiss the Indictment should be **granted in its entirety**.

Even if the dismissal is limited to the Hobbs Act allegations, what preliminarily would be left is the racketeering claim based upon violations of New York Penal Law for extortion. While the Government argues that Enmons by its terms does not extend to non-Hobbs Act predicate acts (Docket No. 170, Gov't Memo. at 37-41), as Kirsch and the codefendants point out (Docket No. 154, Kirsch Memo. at 5-8), Enmons construed the origins of the Hobbs Act as arising from New York extortion law and its construction in labor disputes. Under New York law, pursuit of legitimate union objectives (and not such things as personal payoffs to stop a strike) does not constitute extortion, People v. Forde, 153 A.D.2d 466, 473, 552 N.Y.S.2d 113, 117 (1st Dep't 1990); People v. Dioguardi, 8 N.Y.2d 998, 203 N.Y.S.2d 870 (1960); People v. Adelstein, 9 A.D.2d 907, 908, 195 N.Y.S.2d 27, 28 (2d Dep't 1959), aff'd sub nom. People v. Squillante, 8 N.Y.2d 998, 205 N.Y.S.2d 332 (1960); People v. Feldman, 7 Misc. 2d 794, 791 N.Y.S.2d 361 (Sup. Ct. Kings County 2005); Enmons, supra, 410 U.S. at 405 n.16 (id. at 6). Thus, the racketeering acts alleging violation of state law fail to do so and also **should be dismissed**.

For completeness, the Report next considers Kirsch's arguments about the vagueness of the Indictment and the arguments in Bove's motion.

B. Indictment's Vagueness

Anticipating a Government argument that the alleged objectives are not limited to those stated in the Indictment, Kirsch and the codefendants argue that the Indictment contains impermissibly generic terms which fail to inform defendants of the nature of the charge (Docket No. 154, Kirsch Memo. at 11). Relying on the terms of the Indictment, the Government argues that it does not contain generic terms, going beyond the statutory language of the racketeering

and Hobbs Act (Docket No. 170, Gov't Memo. at 49-53). The Government is correct; the Indictment goes beyond generic terms for the offenses it charges.

As to the Government's contention that it need only allege that defendants "wrongfully" conspired in violation of the Hobbs Act or allege specifically what defendants' non-union objective was (id. at 53), the Government needs to allege (as discussed above) whether the objectives and means of the alleged conspiracy were wrongful beyond the conclusory statement that defendants acted wrongfully.

Nevertheless, Kirsch's motion on the ground of vagueness of the Indictment should be **denied**.

III. Bove's Motion

    A. Facial Insufficiency

Bove also contends that the Indictment is facially insufficient, arguing that it fails to furnish a plain, concise and definite statement of the essential facts constituting the offense charged, as required by Federal Rule of Criminal Procedure 7(c)(1) and Fifth and Sixth Amendment rights (Docket No. 155, Bove Motion at 1). He contends that the Indictment is "extremely sparse in identifying the conduct of any particular defendant which may have led to this accusation (id., Bove Atty. Affirm. ¶ 2). He then quotes the seven paragraphs alleging defendant's role in these offenses (id. ¶ 3), and contends either they fail to state a crime in se or constitute legal free speech activities (id. ¶¶ 3, 4). The Indictment alleged a conspiracy but fails to suggest any acts constituting or evincing an agreement to enter into a conspiracy (id. ¶ 6). In light of the paucity of the Indictment, Bove (and the other defendants) initially moved for a Bill of Particulars (id. ¶ 7; see Docket No. 75), which was denied (Docket Nos.138, 108, 90; see

Docket No. 155, Bove Atty. Affirm. ¶ 11). Bove concludes from this denial of a Bill of Particulars that the Indictment has provided him with notice of all his acts that the Government will seek to prove against him (Docket No. 155, Bove Atty. Affirm. ¶ 11). Bove contends that the Indictment seeks to "criminalize labor organization, union participation, and leadership, per se" (Docket No. 156, Bove Memo. at 1).

The Government argues that this is in fact a challenge to the sufficiency of the evidence (premature at this point in the case) and that the Indictment sets out the elements of the offenses charged (Docket No. 182, Gov't Sur-Reply at 5). As stated above regarding Kirsch's vagueness argument, the Indictment **is facially sufficient** and should be **upheld** on this basis. The issue raised by Bove is whether the Indictment alleges an offense; the Indictment does that. Despite the extent of proffers made to date (cf. Docket No. 181, Bove Reply Memo. at 2), the issue is the sufficiency of the plead document. Bove also challenges the constitutionality of that accusation, which is addressed next.[5]

### B. First Amendment Activity

Bove argues that the Indictment criminalizes lawful First Amendment activity, that is, making statements in his role as a union official. These statements, he contends, are also lawful exercise of his right to organize labor and his freedom of association (see Docket No. 155, Notice of Motion at 1; Docket No. 156, Bove Memo. at 2-3). The Government argues that the speech

---

[5]Bove also argues that the Indictment was facially insufficient because the property interests that the racketeering enterprise allegedly interfered with were fictitious or should not be recognized, Docket No. 156, Bove Memo. at 10-14. Given the recommended disposition under Enmons, this Court need not address whether the alleged victims had property or rights extorted by Bove or the other defendants.

here involves the commission of an offense (Docket No. 170, Gov't Memo. at 59-66; Docket No. 182, Gov't Sur-Reply at 21).

While the Government cites cases from various situations that implicate the First Amendment, only Giboney v. Empire Storage and Ice Co., 336 U.S. 490 (1949) (Docket No. 170, Gov't Memo. at 60-61), involves a labor dispute; there, Missouri anti-trade restraint law was used to enjoin a union from picketing non-union ice peddlers and the Court upheld the restraint on speech that was held to be integral to criminal conduct, id. at 498; see United States v. Stevens, 130 S.Ct. 1577, 1584 (2010). Under that standard, the question remains whether this particular speech is integral to criminal conduct, and the Court's subsequent Enmons decision (as previously discussed) answers that question in the negative.

Here, Bove's is charged with saying things to Marcy Excavation representatives in his role as a Local 17 vice president and business representative in attempting to negotiate a labor agreement with that firm, and for statements he made on a picket line. Later unnamed others committed acts of vandalism but Bove was not alleged to have committed. The conspiracy and racketeering enterprise overlays attempt to extend Bove's liability for those actions. These allegations, however, do not show that Bove sought unnecessary, superfluous services. Therefore, Bove's motion on this ground **should be granted**.

      C.      Constitutionality of the Hobbs Act as Applied

Bove asserts that the Hobbs Act is unconstitutional if applied in these circumstances, failing to provide reasonable notice that his exercise of his free speech, free association, and labor organizing rights would constitute a criminal offense (Docket No. 156, Bove Memo. at 23-24). He also contends that this is an arbitrary extension of criminal statutes of otherwise lawful

union activity and protected speech (id. at 16-18; see Docket No. 181, Bove Reply Memo. at 17-18).

Given the recommended disposition based upon Enmons, this Court need not reach the constitutionality of the Hobbs Act as applied in this Indictment against this defendant.

CONCLUSION

Based upon the above, it is recommended that defendants' motions to dismiss (Docket Nos. 153, 155) be **granted**.

Permission for the Government to file its oversize response (Docket No. 169; see Docket No. 170) and leave to file a sur-reply (see Docket No. 182) are **granted nunc pro tunc.**

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b) and W.D.N.Y. Local Civil Rule 72.3(a).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME OR TO REQUEST AN EXTENSION OF SUCH TIME WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT DISTRICT COURT'S ORDER ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** Thomas v.

Arn, 474 U.S. 140 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988).

The District Court on de novo review will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y. Local Civil Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3) may result in the District Court's refusal to consider the objection.**

SO ORDERED.

/s/ Hugh B. Scott
Hon. Hugh B. Scott
United States Magistrate Judge

Dated: Buffalo, New York
October 12, 2010