UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

     v.

**DECISION AND ORDER**
07-CR-304S

CARL A. LARSON, ET AL.,

                     Defendants.

## I. INTRODUCTION

This is a criminal action brought against Defendants Carl A. Larson, James L. Minter III, Mark N. Kirsch, Gerald H. Franz, Jr., Jeffrey A. Peterson, Gerald E. Bove, Michael J. Caggiano, Jeffrey C. Lennon, Kenneth Edbauer, George Dewald, Michael Eddy, and Thomas Freedenberg.[1]  (Superseding Indictment, Docket No. 4 ("Sup. Indict.").)

Pending before this Court is the Report and Recommendation of the Honorable Hugh B. Scott, United States Magistrate Judge, filed October 12, 2010 (Docket No. 184), recommending that Defendants' motions to dismiss the Superseding Indictment (Docket Nos. 153, 155) be granted.  On November 29, 2010, the government filed objections to the Report and Recommendation.  (Docket No. 196.)  After full briefing, this Court heard oral argument on June 14, 2011, and took the objections under advisement at that time. (Docket No. 226.)

For the reasons discussed below, having considered Judge Scott's Report & Recommendation, the parties' submissions, and the issues raised at oral argument, this Court will set aside Judge Scott's Report & Recommendation, grant the government's

---

[1]Defendants Franz and Minter have entered guilty pleas and are no longer parties to this action. (Docket Nos. 143, 152.)

objections, and deny Defendants' motions to dismiss.

## II.  BACKGROUND

### A.  The Superseding Indictment

On April 1, 2008, the grand jury returned an eight-count superseding indictment against Defendants, charging them with one count of racketeering conspiracy under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d), one count of Hobbs Act extortion conspiracy, 18 U.S.C. § 1951(a), and six counts of attempted Hobbs Act extortion.  (Sup. Indict, Docket No. 4.)  The indictment also includes a claim for RICO forfeiture under 18 U.S.C. section 1963.  (Id. at 60-62.)

#### 1.  Count One Allegations – Racketeering Conspiracy

Count One of the indictment alleges, generally, that Defendants, members of the International Union of Operating Engineers, Local 17, AFL-CIO ("Local 17"), were operating as a criminal enterprise with the objective of extorting property from various construction firms throughout Western New York.  (Id. at 2-5.)  The criminal enterprise operated from about January 1997 to December 2007.  (Id. at 2.)  Defendants Larson, Minter, Kirsch, and Franz were the "primary" figures within the criminal enterprise.  (Id. at 3-5.)

The purported objective of the Local 17 criminal enterprise was to obtain through extortion several types of property, including (1) the property of construction contractors consisting of wages and benefits to be paid pursuant to labor contracts with Local 17; (2) the property of non-union construction laborers consisting of the jobs being performed by those laborers, and the attendant wages and benefits; (3) the property right of construction

contractors and businesses to make business decisions free from outside pressure; and (4) the property of construction contractors consisting of wages and benefit contributions paid by such contractors for "unwanted, unnecessary, and superfluous labor." (Id. at 5.) Defendants used various unlawful means to secure these objectives, including actual violence, threats, intimidation, sabotage of property, and attempted interruption of construction projects. (See id. at 6-8.)

Defendants allegedly engaged in a conspiracy to conduct a pattern of racketeering activity. (Id. at 8-9.) Eleven acts of racketeering are described. (See id. at 10-32.) Each act consists of attempted extortion in violation of the Hobbs Act, 18 U.S.C. § 1951(a), and/or the New York Penal Law, see N.Y. Penal Law § 155.05(2)(e)(i) & (ii). Racketeering Act 11 alleges a conspiracy to commit extortion in violation of federal and state law. (Sup. Indict. at 29-32.)

Different Defendants are named as participants in each of the eleven acts. For example, Defendant Larson is the named actor with respect to Racketeering Act 1, an attempt to extort jobs and other forms of property from STS Construction of Western New York. (Sup. Indict. at 10-12.) Defendants Peterson, Larson, Minter, Franz and Dewald are the alleged participants in Racketeering Act 2, directed at Zoladz Construction Company. (Id. at 12-15.)

### 2. Count Two – Hobbs Act Conspiracy

Count Two charges that Defendants engaged in a Hobbs Act conspiracy from about October 2003-December 2007, with the purpose of extorting the following types of property from Western New York construction contractors: (1) the property right to make business decisions free from pressure; (2) wages and benefits for "unwanted, unnecessary, and

superfluous" labor; and (3) the jobs and associated wages and benefits of the employers' employees. (Id. at 32-33.) The indictment lists 75 overt acts in furtherance of this conspiracy. (Id. at 33-53.) These acts include telephone harassment, damaging construction equipment, making verbal threats, the stabbing of the president of STS Construction by Defendant Caggiano, and attempting to run a contractor employee's car off the road. (See, e.g., id. at 33, 34-35, 37, 38.)

### 3. Counts Three Through Eight – Attempted Hobbs Act Extortion

Counts Three through Eight allege attempted Hobbs Act extortion against Western New York construction firms, based on the same conduct underlying Counts One and Two. (Id. at 53-60.) Different Defendants are named in the various counts. (Id.) Again, the charge is that Defendants attempted to extort from the victims (1) the right to make business decisions free from pressure; (2) wages and benefits for "unwanted, unnecessary, and superfluous" labor; and (3) the jobs of the contractor employees, with attendant wages and benefits. (See, e.g., id. at 53-54 (allegations of attempts to extort from STS Construction).)

### 4. RICO Forfeiture

Finally, the indictment sets forth a claim for forfeiture of property and proceeds deriving from the criminal enterprise, along with benefits relating to Defendants' union positions, under 18 U.S.C. § 1963. (Id. at 60-62.)

## B. Procedural Background

### 1. Defendants' Motions to Dismiss

On April 19, 2010, Defendants filed a joint motion to dismiss the Superseding Indictment. (Docket No. 153.) Defendants maintained that the charges in the indictment

4

did not state a violation of the Hobbs Act under <u>United States v. Enmons</u>, 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973). (Mem. in Supp. of Defs.' Joint Mot. Dismiss (Docket No. 154) at 2-5.) Nor did the alleged conduct constitute extortion under New York state law. (<u>Id.</u> at 5-8.) Defendants also contended that the indictment should be dismissed as impermissibly vague to the extent it could be read to permit Hobbs Act and RICO liability for the conduct alleged therein. (<u>Id.</u> at 11-12.)

Defendant Bove moved separately to dismiss on the ground that the indictment was facially insufficient because it did not allege the essential facts underlying the charges against him. (Mem. in Supp. of Def. Bove's Mot. Dismiss (Docket No. 156) at 1-15.) Defendant Bove also argued that the Hobbs Act is unconstitutional as applied in this case because it criminalizes protected speech and association. (<u>Id.</u> at 16-23.) Finally, Defendant Bove contended that the Hobbs Act impermissibly fails to warn of the potential criminality of the conduct alleged in this case. (<u>Id.</u> at 23-24.)

### 2. The Magistrate Judge's Recommendation

On October 12, 2010, the Honorable Hugh B. Scott, United States Magistrate Judge, issued a Report and Recommendation (Docket No. 184 ("R&R")), recommending that Defendants' motions be granted and that the Superseding Indictment be dismissed. (R&R at 18.)

In evaluating the facial validity of the indictment, Judge Scott identified the key issue as whether Defendants, in engaging in the conduct alleged in the indictment, were pursuing lawful union objectives; namely, the attainment of work for Local 17's members that was not "unwanted or superfluous." (<u>Id.</u> at 12.) Judge Scott determined that the indictment failed on its face because it did not identify which services offered by

Defendants were unwanted, superfluous, or fictitious, but instead relied on the conclusory allegation that the services Defendants sought to be provided were "superfluous" and "unwanted." (Id. at 13.) Judge Scott explained:

> The Enmons reference to "unwanted" services is not to cover services refused by a non-union contractor; otherwise, any labor action against a non-union shop once those services are declined would constitute a Hobbs Act violation.

(Id.) The indictment also did not allege that Defendants sought personal payoffs or fictitious jobs for union members, so as to bring the conduct within the scope of the Hobbs Act. (Id.)

Judge Scott concluded that Defendants' conduct, as alleged, was not for any unlawful purpose. Rather, it was aimed at the legitimate objective of obtaining union jobs from reluctant construction contractors, which Enmons recognizes as lawful labor action. (Id.) Accordingly, the indictment failed to allege any Hobbs Act violations. (Id.)

Next, Judge Scott considered whether the indictment properly alleged extortion under New York Penal Law. (Id. at 14.) Judge Scott pointed out that under New York law, pursuit of legitimate union objectives is not punishable as extortion. (Id.) Because Defendants' objectives here were legitimate, the RICO count could not be predicated on state law extortion allegations.[2] (Id.)

Judge Scott also addressed Defendant Bove's separate motion. Judge Scott rejected the argument that the indictment was facially insufficient for failure to allege the specific criminal conduct of each Defendant. (Id. at 16.) However, Judge Scott agreed that the indictment failed to the extent it criminalized protected speech and association by

---

[2]Although the question was unnecessary to the disposition of Defendants' motions, Judge Scott also considered Defendants' argument that the indictment was impermissibly vague. (R&R at 14.) On this point, Judge Scott agreed with the government that the indictment was sufficiently specific to withstand a vagueness challenge. (Id.)

union members.  (Id. at 17.)  Under <u>Giboney v. Empire Storage & Ice Co.</u>, 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949), speech in the context of a labor dispute may be criminalized where it is integral to criminal conduct.  (Id.)  However, because the indictment did not allege the requisite unlawful union objective upon which to base criminal liability, speech in connection with the conduct in the indictment could not be criminalized.  (Id.) Accordingly, Judge Scott recommended that Defendant Bove's motion to dismiss be granted on this ground.[3]  (Id.)

The government filed objections to Judge Scott's Report and Recommendation. <u>See</u> 28 U.S.C. § 636(b)(1); <u>see also</u> Fed. R. Crim. P. 10 (providing that a magistrate judge may perform the duties authorized by 28 U.S.C. § 636 in a federal criminal proceeding). Defendants filed responses to the objections.  This Court heard oral argument from the parties on June 14, 2011.

## III.  DISCUSSION

Under 28 U.S.C. § 636(b)(1), if objections are made to a magistrate judge's report and recommendation regarding a dispositive matter, the district court must make a *de novo* determination of any disputed findings and conclusions.  28 U.S.C. § 636(b)(1).  The court may accept, reject, or modify any of the proposed findings and recommendations of the magistrate judge.  Id.

Rule 12(b) of the Federal Rules of Criminal Procedure provides that a motion to dismiss may raise "any defense, objection, or request which is capable of determination

---

[3]Judge Scott declined to address the alternative argument that the Hobbs Act is unconstitutional as applied in this case.  (R&R at 18.)

without a trial of the general issue." Fed. R. Crim. P. 12(b)(2).  A pre-trial motion to dismiss

an indictment under Rule 12 must satisfy a "high standard."  United States v. Lazore, 90

F.Supp.2d 202, 203 (N.D.N.Y. 2000).  In deciding a motion to dismiss an indictment for

failure to state a criminal offense, a court must assume the truth of the allegations in the

indictment and determine whether the indictment is valid on its face.  United States v.

Bicoastal Corp., 819 F.Supp. 156, 158 (N.D.N.Y. 1993).  This Court is not permitted to

"look[] beyond the face of the indictment and [draw] inferences as to the proof that would

be introduced by the government at trial."  United States v. Alfonso, 143 F.3d 776, 776 (2d

Cir. 1998).

## A.  Defendants' Joint Motion to Dismiss the Indictment

Defendants contend that the Superseding Indictment fails on its face because it

does not allege any criminal conduct.  As noted, the indictment in this case charges a

RICO conspiracy predicated on violations of the Hobbs Act and New York extortion law.[4]

It also alleges a Hobbs Act conspiracy and attempted Hobbs Act extortion.  Thus, the

validity of the indictment at this stage of the proceedings turns on whether it has properly

alleged violations of the Hobbs Act and/or New York extortion law.

---

[4]The RICO statute provides that "[i]t shall be unlawful for any person who has received any
income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or
indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the
establishment or operation of, any enterprise which is engaged in, or the activities of which affect,
interstate or foreign commerce."  18 U.S.C. § 1962(a).  State law extortion and Hobbs Act violations
constitute "racketeering activity" for purposes of establishing RICO liability.  18 U.S.C. § 1961(1).  The
parties do not dispute that, aside from the predicate crimes constituting the "pattern of racketeering
activity," the indictment properly alleges the other elements of a RICO violation.

**1. Hobbs Act Liability**

    **a. Legal Standards**

The Hobbs Act provides in relevant part:

> (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires to do so, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.
> . . .
> (b) As used in this section –
> . . .
> (2) the term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

18 U.S.C. § 1951.

In <u>United States v. Enmons</u>, 410 U.S. 396, 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973), the Supreme Court of the United States addressed the applicability of the Hobbs Act to union activity. The appellees in that case were union members and officials who were seeking a new collective bargaining agreement with Gulf States Utilities Company ("Gulf States") while the employees were on strike. 410 U.S. at 397. The indictment charged that appellees had conspired to obstruct commerce, and that in furtherance of the conspiracy they

> would obtain the property of [Gulf States] in the form of wages and other things of value with the consent of [Gulf States] . . ., such consent to be induced by the wrongful use of actual force, violence and fear of economic injury by (the appellees) and co-conspirators, in that (the appellees) and the co-conspirators did commit acts of physical violence and destruction against property owned by [Gulf States] in order to force said Company to agree to a contract with Local 2286 of the International

> Brotherhood of Electrical Workers calling for higher wages and
> other monetary benefits.

Id. at 397-98 (internal quotations omitted).  The alleged violent acts by the appellees included firing high-powered rifles at company transformers, draining the oil from a company transformer, and blowing up a transformer substation owned by the company. Id. at 398.

The Supreme Court held in a 5-4 decision that the alleged conduct did not constitute a violation of the Hobbs Act, and thus that the indictment properly had been dismissed. Id. at 412.  First, the Court considered the meaning of the term "wrongful" as it applied to the definition of "extortion" under the Act.  Id. at 399-400.  The Court explained that the term "wrongful" would be superfluous if it described only the means used to obtain the property, because *any* use of force or violence to obtain property would be wrongful.  Id. Thus, the term "wrongful" must have been intended to refer to the objective of the alleged extortionist in seeking the property:  "'[W]rongful' has meaning in the Act only if it limits the statute's coverage to those instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property."  Id. at 400 (original emphases omitted).

The Court explained that the Hobbs Act had been properly applied in cases where union officials had used fear or force to obtain personal payoffs or "wages" for "imposed, unwanted, superfluous and fictitious services" of workers.  Id. at 400.  In these instances, the union officials or members had no legitimate claim to the employer's property.  Id. However, the Act could not be read to reach "the use of violence to achieve legitimate union objectives, such as higher wages in return for genuine services which the employer

seeks," because the employers would receive honest, sought-for labor and the workers would be entitled to compensation therefor.  Id.

Next, the Court turned to the Hobbs Act's legislative history.  The Act was passed in response to the Supreme Court's decision in United States v. Local 807, 315 U.S. 521, 62 S.Ct. 642, 86 L.Ed. 1004 (1942).  Enmons, 410 U.S. at 402.  In Local 807, members of the teamsters union in New York City had extracted payments from out-of-town truck drivers in exchange for the "unwanted and superfluous" service of driving the out-of-town trucks to and from the city.  Id. at 401-02.  In several instances, the teamsters members had simply taken the "wages" and disappeared without performing any service.  Id. at 402.

The Local 807 Court applied the predecessor to the Hobbs Act, which excepted from criminal liability the extraction of "wages by a bona-fide employer to a bona-fide employee."  Id. at 401.  The Local 807 Court held that the teamsters' conduct fell within the "wage" exception to the statute despite the fact that the work they provided was unwanted and unneeded.  Id. at 402.

The Enmons Court noted that Congress responded swiftly to the Local 807 decision by enacting the Hobbs Act, which eliminated the "wage" exception to extortion liability, so as to prevent "both union members and nonunion people from making use of robbery and extortion under the guise of obtaining wages in the obstruction of interstate commerce."  Id. at 402-03 (quoting 91 Cong. Rec. 11900 (statement of Congressman Hannock)).  The Enmons Court concluded that the Hobbs Act "did not sweep within its reach violence during a strike to achieve legitimate collective-bargaining objectives."  Id. at 404.

The Court reasoned that construing the Hobbs Act to apply to the use of force to obtain the "legitimate union demands of higher wages" would impermissibly broaden the

reach of the statute to "all overtly coercive conduct in the course of an economic strike, obstructing, delaying, or affecting commerce." Id. at 410. The Court noted:

> Neither the language of the Hobbs Act nor its legislative history can justify the conclusion that Congress intended to work such an extraordinary change in federal labor law or such an unprecedented incursion into the criminal jurisdiction of the States.

Id. at 411.

Significantly, Enmons did not discuss what constitutes a legitimate labor objective other than striking for higher wages. The Court provided only two examples of illegitimate labor objectives: "the exaction of personal payoffs, or the pursuit of 'wages' for unwanted or fictitious services[.]" Id. at 407.

Most courts applying Enmons have interpreted it narrowly, even within the labor context. In United States v. Markle, 628 F.3d 58 (2d Cir. 2010), the Court of Appeals for the Second Circuit considered whether violence by a members of one union against members of another union during a dispute at a construction site fell within the Enmons exception to the Hobbs Act. Id. at 60. The Second Circuit concluded that "a violent attack on members of a competing union to gain the competing union's work is not a legitimate labor union objective within the meaning of Enmons." Id. at 62. Nothing in the statutory text or legislative history suggested that inter-union violence not connected to a labor-management dispute was exempt from Hobbs Act liability. Id. at 63. The court held that "[t]he Enmons defense is limited to labor-management disputes and does not extend to inter-union violence." Id. See also United States v. Debs, 949 F.2d 199, 201 (6th Cir. 1991) (Enmons exception did not apply to union official's attempts to use violence to force another union member to withdraw his candidacy for union president; "Enmons has not

12

been extended beyond its own facts"); <u>United States v. Jones</u>, 766 F.2d 994, 1002-03 (6th Cir. 1985) (doubting whether <u>Enmons</u> would apply to the use of violence outside the collective bargaining context and in pursuit of goals other than higher wages and against individuals other than the strikers' employer); <u>United States v. Russo</u>, 708 F.2d 209, 215 (6th Cir. 1983) (finding <u>Enmons</u> inapplicable where an employer coerced individual employees to agree to amend the collective bargaining agreement to the employees' detriment); <u>United States v. Porcaro</u>, 648 F.2d 753, 760 (1st Cir. 1981) (<u>Enmons</u> dealt specifically with the problem of strike violence); <u>United States v. Cerilli</u>, 603 F.2d 415, 419 (3d Cir. 1979) ("The [<u>Enmons</u>] Court's reasoning was obviously and explicitly tied to the labor context and more specifically to the strike context.").

Several decisions have addressed the <u>Enmons</u> exception in the context of a union's attempt to pressure a new employer into accepting a collective bargaining agreement.

In <u>A. Terzi Productions, Inc. v. Theatrical Protective Union</u>, 2 F.Supp.2d 485 (S.D.N.Y. 1998), an employer, A. Terzi Productions ("ATP"), brought a civil action alleging, *inter alia*, Hobbs Act and RICO claims against the Theatrical Protective Union, Local No. One, AFL-CIO ("Local One"), and two of its officials. <u>Id.</u> at 490. The claims arose out of Local One's picketing of a televised fashion show at which ATP was working for the purpose of pressuring ATP into entering into a collective bargaining agreement with Local One. <u>Id.</u> at 489. The picketing erupted into violence. <u>Id.</u> Additionally, the picketers threatened ATP's and the fashion show producer's employees and interfered with ingress and egress at the show, and Local One's president made threatening phone calls to ATP's principal officer, warning that the union would cause "problems" for ATP at the show unless ATP signed a collective bargaining agreement. <u>Id.</u> After the show, ATP signed the

13

collective bargaining agreement.  Id.

Local One sought dismissal of the RICO claim, which was predicated on Hobbs Act violations, based on the Enmons exception.  Id. at 504.  Then-Judge Sotomayor stated:

> The question posed here is whether Enmons protection should apply to a union's actual and threatened use of force to compel an employer to recognize and bargain with the union where the union is not authorized to represent any of the employer's employees.  I conclude that Enmons does not extend this far.

Id. at 506.  Local One was not authorized to negotiate an agreement on behalf of ATP's employees, and the employees did not want Local One's representation.  Id.  The court noted that

> [i]t is a basic tenet of federal labor law that a union has no right to demand that an employer recognize or bargain collectively with the union unless it has first obtained the majority backing of that employer's employees and been certified as their bargaining representative.

Id.  Because Local One was not properly authorized and certified to make collective bargaining demands against ATP, its objectives were not legitimate and Enmons was inapplicable.  Id.  The court reasoned that "forcing a collective bargaining agreement upon unwilling employees and their employer is 'wrongful' within the Hobbs Act's meaning; the union is an outside meddler with no lawful claim to the employer's property."  Id. at 507.

In Asbestos & Lead Removal Corporation v. Severino, et al., 2007 WL 925485 (E.D.N.Y. March 23, 2007) (ALR), as in A. Terzi Productions, an employer brought a civil RICO action against a union and its principals based on alleged Hobbs Act violations.  Id. at **1-2.  ALR alleged that the Laborers International Union of North America Local 78 ("Local 78") undertook a series of illegal acts intended to extort ALR into entering a collective bargaining agreement with Local 78.  Id. at *1.  These acts included breaking

14

ALR's president's hand with a billy club and trying to run him over with a car; vandalizing ALR and employee vehicles; menacing an ALR employee on the Long Island Expressway; and spray painting and throwing bricks at the president's house.  Id.

Local 78 argued the RICO claim should be dismissed under Federal Rule of Civil Procedure 12(b)(6).  Id. at *1.  Local 78 noted that, unlike in A. Terzi Productions, which concerned a fashion industry union, the case at bar involved a construction industry union. Id. at *2.  Under federal labor standards, a union may seek a collective bargaining agreement with a construction employer even without recognition of the union by a majority of the employer's workers.  Id. (citing 29 U.S.C. § 158(f)).  Thus, Local 78 contended its actions in pursuing a collective bargaining agreement with ALR were for a lawful objective and fell within the Enmons exception.  Id.

The district court rejected this argument.  The court explained that none of the material facts in Enmons were present in that case:

> There is no strike.  There is no expired collective bargaining agreement.  There is no apparent effort, at this stage, to get higher wages for workers.  There are no facts demonstrating or even suggesting support among ALR employees for union representation.  There is only an alleged demand for union recognition based on several incidents of violence.

Id. at *3.  Despite the fact that construction industry labor standards could afford Local 78 a legitimate basis to demand union recognition from ALR, there was no indication that "the violent acts alleged were incidental to bona fide bargaining in the context of a labor dispute."  Id. at *4.  The court reasoned:

> To apply Enmons, where the strike to obtain higher wages was unambiguously protected activity and the violence was clearly incidental to it, to this case would have the tail wagging the dog. It would require a holding that as long as violent acts occur

15

> between a labor union and a company where a pre-hire agreement was possible, there are no circumstances in which the Hobbs Act would prohibit any level of violence.

Id. at *4.  The court refused to apply Enmons to dismiss the Hobbs Act-based claims.  Id. See also  United States v. Franks, 511 F.2d 25, 31-32 (6th Cir. 1975) ("[V]iolence designed to coerce a businessman into changing his establishments from non-union to union is certainly violence designed to extort."); C&W Constr. Co. v. Brotherhood of Carpenters and Joiners of Am., Local 745, AFL-CIO, 687 F.Supp. 1453, 1469 (D. Haw. 1988) (union's conduct against employer did not fall within Enmons exception; there was no collective bargaining agreement and employer's employees did not want union's representation).

### b.  Sufficiency of the Indictment Under Enmons

Rule 7(c) of the Federal Rules of Criminal Procedure requires that an indictment contain a "plain, concise and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c).  An indictment is constitutionally sufficient if it (1) contains the essential elements of the offense charged so as to inform the defendant of the nature and cause of the accusation; (2) contains enough detail to enable the defendant to plead double jeopardy in a future prosecution based on the same set of facts; and (3) prevents prosecution for crimes based on evidence not presented to the grand jury. United States v. Walsh, 194 F.3d 37, 44 (2d Cir. 1999) (citing United States v. Silverman, 430 F.2d 106, 110 (2d Cir.), modified, 439 F.2d 1198 (2d Cir. 1970)).  "We have often stated that 'an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" United States v. Stavroulakis, 952 F.2d 686, 693 (2d Cir. 1992) (quoting United States v. Tramunti, 513 F.2d 1087, 1113 (2d Cir. 1975), and citing cases).

Under these standards, this Court finds the indictment sufficient to state violations of the Hobbs Act, as judicially modified by Enmons.  The indictment provides approximate dates, names, and places, and alleges that Defendants sought the "property" of their victims through the "wrongful use of actual or threatened force, violence, or fear."  The indictment generally charges, for example, that from January 1997 through May 2003, Defendant Larson,

> with others known and unknown, . . . did attempt to obtain property of STS Construction Company of Western New York (hereinafter, "STS"), and its employees[,] such property consisting of (i) STS' right to make business decisions free from outside pressure, (ii) wages and benefits to be paid by STS for unwanted, unnecessary, and superfluous labor, and (iii) STS' employees' jobs and associated wages and benefits, at several construction project locations, to include, among others:  the Roswell Park Cancer Institute site, . . . the Rath Building site, . . . the Buffalo Psychiatric Center site, . . . the Army Corps of Engineers site, . . . and the General Motors Plant . . . with the consent of STS and its owner Timothy P. Such . . . induced by the *wrongful* use of actual and threatened force, violence and fear[.]

(Sup. Indict. at 10-11 (emphasis added).)  This allegation tracks the elements of Hobbs Act extortion. 18 U.S.C. § 1951 (requiring a deprivation of property, with the victim's consent, through the wrongful use of actual or threatened force, violence, or fear).  It also uses the term "wrongful" to describe the overarching objective in using "actual and threatened force, violence and fear," and as such takes the allegation outside the Enmons exception.  The other Hobbs Act extortion allegations in the indictment use the same language.  (Sup. Indict. at 13-14, 15-16, 18-19, 20-21, 27-28, 29-30, 53-60.)

### c.  "Wrongful" Union Objective

Defendants argue that, notwithstanding the indictment's use of the term "wrongful"

to characterize their alleged conduct, the indictment fails to state a Hobbs Act violation because the substantive allegations do not describe a "wrongful" union objective. Instead, the allegations merely describe Defendants' goal of obtaining new collective bargaining agreements with construction employers in Western New York. This, according to Defendants, is a legitimate union objective. As such, under Enmons the indictment fails to state a Hobbs Act violation and is subject to dismissal.

It is clear that Hobbs Act liability in the context of a labor-management dispute turns on the legitimacy of the union's objective in engaging in the alleged conduct. If the union acts in furtherance of a legitimate labor objective, the use of force or violence incident to the pursuit of that objective is not subject to Hobbs Act liability (although it might be subject to prosecution under other provisions). However, if a union's objective is not legitimate, Enmons will not protect it from prosecution under the Hobbs Act.

Contrary to Defendants' assertion, even if a union's ultimate objective is to obtain collective bargaining agreements with new employers, this is insufficient on its own to bring the union's extortionate conduct under the Enmons exception. To read Enmons broadly to hold that, so long as the union is seeking a collective bargaining or similar agreement for its members, it is irrelevant whether violence, threats, and property damage are the primary tactics employed, would be to extend Enmons far beyond the narrow context in which it was decided. See Enmons, 410 U.S. at 399 (narrowly framing issue as whether the Hobbs Act proscribes "violence committed during a *lawful* strike for the purpose of inducing an employer's agreement to *legitimate* collective-bargaining demands.") (emphases added); Markle, 638 F.3d at 62 (noting that the circuit courts have rarely extended Enmons beyond the context of strikes or bona fide negotiations between unions

and employers) (citing cases); <u>A. Terzi Productions</u>, 2 F.Supp.2d at 506-07 (concluding that a union's attempt to secure a collective bargaining agreement with a new employer without the required employee support was an illegitimate objective); <u>ALR</u>, 2007 WL 925485, at **3-4 (<u>Enmons</u> inapplicable where indictment did not describe violent union conduct in the context of a bona fide union-employer dispute, but instead described "an alleged demand for union recognition based on several incidents of violence.").[5]

This reading of <u>Enmons</u> is in accordance with the Supreme Court's interpretation of the term "wrongful" in the Hobbs Act. The <u>Enmons</u> Court concluded that "wrongful" referred to the use of coercive conduct when the extortionist has no lawful claim to the property sought. 410 U.S. at 400. In a legitimate strike situation, the union has a lawful platform on which to seek higher wages and better terms for its members. However, when a union pursues agreements with new employers through primary tactics of violence, threats, and intimidation, it does not have a lawful platform on which to claim the property of the employer. The use of such tactics is therefore "wrongful" under the Hobbs Act. See <u>A. Terzi Productions</u>, 2 F.Supp.2d at 507 ("[F]orcing a collective bargaining agreement upon unwilling employees and their employer is 'wrongful' within the Hobbs Act's meaning; the union is an outside meddler with no lawful claim to the employer's property.").

In this case, much of the conduct alleged in the indictment is unrelated to a strike or other bona fide dispute with an employer. Rather, it sounds in harassment of employers, through violence and intimidation, aimed at coercing them into entering into

---

[5]The legislative history of the Hobbs Act is narrowly focused as well. As the <u>Enmons</u> Court noted, in debating the Hobbs Act, Congressman Hobbs addressed the question of violence during a strike and emphatically stated that the Act did not cover violence during a lawful strike. 410 U.S. at 405-06 (citing 89 Cong.Rec. 3213). However, in the cited legislative history Congress did not discuss other activities by unions that are "legitimate" and fall outside the scope of the Hobbs Act.

agreements to hire Local 17 members for their projects.  (See, e.g., Sup. Indict. at p. 37 (allegation that Defendant Caggiano stabbed the STS Construction president at a local restaurant); 42-43 (allegation that Defendant Larson and others surrounded Wadsworth Golf Construction employees and made threatening statements); 50 (allegation that Defendants Larson and Peterson pushed a gate over at a National Fuel cleanup site, causing injury to a guard).)    The alleged conduct falls outside the narrow Enmons exception.

Defendants point out, as did the defendants in ALR, that under federal labor standards, unions representing construction workers are lawfully permitted to approach construction employers to enter into collective bargaining agreements without the majority support of the employees.  See ALR, 2007 WL 925485, at *2.

In general, under federal labor standards, a union may not seek recognition from an employer without first obtaining majority support from the existing employees.  Nat'l Labor Relations Bd. v. Local Union No. 103, Intern. Ass'n of Bridge, Structural and Ornamental Iron Workers, 434 U.S. 335, 344, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978) ("Local 103").  This rule is meant to prevent coercive tactics by unsupported unions, such as "the continuous coercion of an organizational picket line."  Id. at 347 n.9 (quoting 105 Cong.Rec. 1731 (1959) (remarks of Sen. Dirksen)).

However, it is not an unfair labor practice for a union in the construction industry to seek union recognition without majority employee support.  See 29 U.S.C. § 158(f); Local 103, 434 U.S. at 345.  Section 158(f) permits a union and a construction employer to enter into a pre-hire agreement, a precursor to a collective bargaining agreement, without majority employee approval.  Local 103, 434 U.S. at 345.  This exception was made to the

general rule because of the short-term nature of employment in the construction industry and the construction employer's need for predictability in costs.  See Jim McNeff, Inc. v. Todd, 461 U.S. 260, 266, 103 S.Ct. 1753, 17 L.Ed.2d 830 (1983); Nat'l Labor Relations Bd. v. Goodless Bros. Elec. Co., Inc., 285 F.3d 102, 104 (1st Cir. 2002).

This does not mean, however, that a union may legitimately use an unlimited array of coercive tactics to secure such an agreement with an employer.  As the Supreme Court explained in Local 103, in enacting the construction industry exception, Congress was concerned about "coerced designations of bargaining agents."  434 U.S. at 347-48.  The Court stated:

> Congress was careful to make its intention clear that prehire agreements were to be arrived at voluntarily, and no element of coercion was to be admitted into the narrow exception being established to the majority principle. Representative Barden, an important House Floor leader on the bill and a conferee, introduced as an expression of legislative intent Senator Kennedy's explanation the year before of the voluntary nature of the prehire provision: "Mr. Kennedy: I shall answer the Senator from Florida as follows—and it is my intention, by so answering, to establish the legislative history on this question: It was not the intention of the committee to require by section 604(a) the making of prehire agreements, but, rather, to permit them; *nor was it the intention of the committee to authorize a labor organization to strike, picket, or otherwise coerce an employer to sign a prehire agreement where the majority status of the union had not been established. The purpose of this section is to permit voluntary prehire agreements.*" 105 Cong.Rec. 18128 (1959), 2 Leg.Hist. 1715. The House Conference Report similarly stressed that "[n]othing in such provision is intended . . . to authorize the use of force, coercion, strikes, or picketing to compel any person to enter into such prehire agreements." H.R.Rep. No. 1147, 86th Cong., 1st Sess., 42 (1959), 1 Leg.Hist. 946, U.S.Code Cong. & Admin.News 1959, pp. 2318, 2514.

434 U.S. at 348 n.10 (emphasis added).

The allegations here do not state an attempt to secure a voluntary pre-hire or collective bargaining agreement between a willing construction employer and a union, as permitted by section 158(f). Instead, the indictment alleges that Defendants used a variety of coercive means to force collective bargaining agreements upon the employers at issue. At this stage of the proceedings, this Court will not dismiss the indictment on the ground that Defendants' objectives were "legitimate" because they did not require majority employee support to approach the employers for labor agreements.

### d. Deprivation of "Property"

Defendants also make the related contention that the indictment substantively fails to allege the attempted deprivation of "property" as required by the Hobbs Act. Under the Hobbs Act, an extortionist must obtain "property" from another. 18 U.S.C. § 1951. In the indictment, the government generally alleges four different types of property that were sought to be obtained by Defendants:

> a. Property of construction contractors consisting of wages and benefits to be paid pursuant to labor contracts with Local 17 at construction projects in Western New York.
> b. Property of non-union construction laborers consisting of the jobs being performed by those non-union laborers and the wages and benefits associated with those jobs at construction projects in Western New York.
> c. Property of construction contractors and businesses consisting of the right to make business decisions free from outside pressure at construction projects in Western New York.
> d. Property of construction contractors consisting of wages and employee benefit contributions paid or to be paid by said contractors for unwanted, unnecessary, and superfluous labor.

(Sup. Indict. at 5.)

Defendants argue that these categories of "property" as a whole are not cognizable under the Hobbs Act, because the alleged "property" is nothing more than collective

22

bargaining agreements with the employers, which are legitimate union goals.

Even assuming that the categories of "property" listed in the indictment are merely another way of saying "collective bargaining agreements," as discussed above, the indictment sufficiently alleges that Defendants' objective in seeking collective bargaining agreements through coercive measures was *not* a legitimate one. The relevant question is whether a collective bargaining agreement, with the attendant jobs and benefits flowing to union members, can be "property" under the Hobbs Act.

In general, if an employer is forced to hire union workers at higher wages than it had previously been paying to its non-union employees, the employer has suffered a deprivation in the form of added costs. Additionally, the union members hired for the jobs in question receive the wages and benefits associated with those jobs, and therefore gain valuable consideration. As such, the coerced acceptance of a collective bargaining or similar agreement constitutes a deprivation of "property" under the Hobbs Act. See United States v. Franks, 511 F.2d 25, 32 n.8 (6th Cir. 1975) ("By coercing a businessman into changing his establishments from non-union to union, or risk being bombed, one deprives the businessman of his 'property' interest of an economic advantage, of using non-union labor, or of operating his business.").[6]

---

[6]Defendants also object to two of the sub-categories of "property" allegedly sought from the employers. First, they argue that although the indictment recites a conclusory allegation that Defendants sought "unwanted, unnecessary, and superfluous labor," the substantive allegations do not bear this out. Instead, the indictment in substance charges that Defendants sought to provide honest, actual labor, and that the work was "unwanted" only in the sense that the employers did not want to hire Local 17 members for their projects (but instead wanted to hire non-union workers). Second, Defendants contend that there is no "property" right to conduct business "free from outside pressure," as alleged.

Because the indictment otherwise has sufficiently alleged the attempted deprivation of "property" under the Hobbs Act – *i.e.*, collective bargaining agreements with the employers – it is unnecessary at this juncture to determine whether these distinct categories of "property" are cognizable as well.

**2. New York State Extortion**

Defendants contend, and Judge Scott concluded, that the indictment fails to allege the crime of extortion under New York law. Attempted state law extortion is named as a primary or alternative predicate crime for each of the eleven alleged acts of racketeering in the indictment. (Sup. Indict. at 11, 14, 16, 19, 21, 22, 24, 25, 26, 28, 30.)

Defendants maintain that an exception equivalent to that in <u>Enmons</u> exists with respect to New York's law of extortion, because the Hobbs Act was itself modeled on New York law, under which there was a recognized labor exception to liability. Additionally, New York case law still provides that one would not be guilty of extortion for attempting to achieve legitimate union goals. Because the indictment fails to allege conduct by Defendants in the pursuit of anything other than legitimate union goals, Defendants argue it fails to allege the crime of extortion under New York law.

The government counters that any labor exception under New York law is narrower than the federal-law exception crafted in <u>Enmons</u>. The government points out that the language of the extortion statute, while excepting from extortion liability threats of strikes and boycotts on behalf of unions, has no such exception for threats of physical violence and property damage on behalf of unions. Moreover, the New York cases delineating the labor exception do not address violent union conduct in pursuit of union objectives.

In relevant part, New York penal law provides:

> A person obtains property by extortion when he compels or induces another person to deliver such property to himself or to a third person by means of instilling in him a fear that, if the property is not so delivered, the actor or another will:
> (i) Cause physical injury to some person in the future; or
> (ii) Cause damage to property; or
> (iii) Engage in other conduct constituting a crime; or

24

. . .

> (vi) Cause a strike, boycott, or other collective labor group action injurious to some person's business; except that such a threat shall not be deemed extortion when the property is demanded or received for the benefit of the group in whose interest the actor purports to act[.]

New York Penal Law § 155.05(e)(i), (ii), (iii) & (vi). By its terms, there is an exception to extortion liability for threats of strikes, boycotts, or other "collective labor group action" made by a union representative for the union's benefit. However, this exception is not applicable to threats of violence, property damage, or other types of harm.

New York state court decisions regarding extortion in the labor context primarily concern union representatives taking personal payoffs in return for ending or diverting adverse union action. In People v. Dioguardi, 8 N.Y.2d 260, 203 N.Y.S.2d 870 (N.Y. 1960), the defendants were McNamara, an official of the local teamsters union, and Dioguardi, the owner of a "publishing house" that allegedly was a front for an extortion scheme. 8 N.Y.2d at 263. A local stationery supply business was picketed and subjected to protesting by four different unions over a period of several months, and its ingoing and outgoing shipments were blocked. Id. at 263-64. The business was approached by McNamara, who offered to assist in resolving the dispute through the use of Dioguardi's company's "services." Id. at 264-65. Eventually, the business owner agreed to pay a $3,500 fee, along with a $200 monthly retainer, to engage McNamara and Dioguardi's company to stop the labor disruption. Id. at 267.

The Court of Appeals of New York upheld McNamara and Dioguardi 's extortion convictions. Id. at 268. The court stated:

> The picketing here . . . may have been perfectly lawful in its inception (assuming it was part of a bona fide organizational

> effort) and may have remained so – despite its potentially
> ruinous effect on the employers' businesses – so long as it
> was employed to accomplish the legitimate labor objective of
> organization.  Its entire character changed from legality to
> criminality, however, when it was used as a pressure device to
> exact the payment of money as a condition of its cessation[.]

Id. at 271.  See also People v. Forde, 153 A.D.2d 466, 473, 552 N.Y.S.2d 113 (1st Dept.

1990) (union representative demanded $2,000 from flooring company in exchange for

refraining from invoking a collective bargaining provision that would have caused financial

harm to the flooring company; indictment for extortion was upheld); People v. Adelstein,

9 A.D.2d 907, 908, 195 N.Y.S.2d 27 (2d Dept. 1959), aff'd sub nom. People v. Squillante,

8 N.Y.2d 998 (N.Y. 1960) (reversing extortion conviction of union agent allegedly involved

in a scheme to require local businesses to use certain union "cartmen" to dispose of their

garbage; proof failed to establish beyond a reasonable doubt that "(1) the appellant was

actuated by the purpose of obtaining a financial benefit for himself or his codefendants and

was not attempting in good faith to advance the cause of unionism; or (2) that there was

any relationship among appellant and his codefendants which would sustain the inference

that they aided each other in securing any personal benefit from the termination of the

services of the nonunion cartmen[.]"); see also People v. Feldman, 7 Misc.3d 794, 811,

791 N.Y.S.2d 361 (N.Y. Sup. 2005) (citing the above cases and Enmons for the proposition

that otherwise legal actions, such as picketing or enforcing a collective bargaining

agreement, can become extortionate where a personal payoff is sought or there is an

illegitimate purpose for the payment).

In Enmons, the Supreme Court noted that the Hobbs Act "incorporate[d] New York's

conventional definition of extortion – 'the obtaining of property from another . . . with his

26

consent, induced by a wrongful use of force or fear, or under color of right.'" 410 U.S. at

406 n.16 (quoting New York Penal Law and citing several remarks of Congressmen). The

Court, interpreting New York law at the time, stated:

> Judicial construction of the New York statute reinforces the conclusion that, however militant, union activities to obtain higher wages do not constitute extortion. For extortion requires an intent "to obtain that which in justice and equity the party is not entitled to receive." . . . An accused would not be guilty of extortion for attempting to achieve legitimate labor goals; he could not be convicted without sufficient evidence that he "was actuated by the purpose of obtaining a financial benefit for himself . . . and was not attempting in good faith to advance the cause of unionism . . . ."

Id. (quoting People v. Cuddihy, 151 Misc. 318, 324, 271 N.Y.S. 450 (N.Y. Gen. Sess.

1934), aff'd, 243 A.D. 694, 277 N.Y.S. 960 (1st Dept. 1935); and Adelstein, 9 A.D.2d at

908). See also Andrea Doreen Ltd. v. Building Material Local Union 282, 299 F.Supp.2d

129, 150 (E.D.N.Y. 2004) (interpreting New York extortion law to exempt strike violence to

enforce contractual rights of workers).

The New York statutes and decisions, and the *dicta* in Enmons, establish that

certain types of actions in pursuit of legitimate union objectives would not constitute

extortion under New York law.[7]   These provisions and cases do not, however, identify the

parameters of legitimate labor objectives, except for that of labor "organization." Dioguardi,

---

[7]The government contends, and this Court agrees, that the Enmons exception itself does not apply to extortion liability under New York law. First, that case's holding concerned liability under the Hobbs Act only. 410 U.S. at 399. Second, the Court based its holding in part on the rationale that Congress did not intend to interject federal criminal liability into an area that traditionally had been policed by the States. Id. at 411. To read Enmons to compel the elimination of state-law liability for the same conduct would undermine the federal-state balance the Court sought to preserve. See also Smithfield Foods, Inc. v. United Food and Commercial Workers Int'l Union, et al., 585 F.Supp.2d 789, 800-01 (E.D.Va. 2008) ("[L]ower courts consistently have held that union conduct alleged to violate a state extortion statute can form the basis of a RICO predicate act, without regard for whether the "wrongfulness" element of Enmons is established.").

8 A.D.2d at 271; see also N.Y. Penal Law § 155.05(e)(vi) (exempting from extortion liability threats of strikes, boycotts, or other collective labor group action by a union representative on behalf of a union). Nothing in these sources suggest that, merely because a union's goal is to obtain new collective bargaining agreements with employers, the union's coercive conduct necessarily falls outside the reach of the extortion statute. Moreover, this Court has found no authority providing that actual or threatened violence or destruction by a union should be exempted from the application of the extortion provision. Rather, the plain language of section 155.05 generally prohibits obtaining property through threats of physical injury or property damage, without exception for threats made on behalf of unions.[8] N.Y. Penal Law § 155.05(e)(i)&(ii).

Applying these principles to the instant case, this Court finds the indictment sufficiently states conduct violating New York extortion law. As noted, the indictment alleges conduct by Defendants that was completely unrelated to a strike or other bona fide employer-union dispute. Rather, much of the alleged conduct consists of harassment of employers, using actual and threatened violence and property damage, aimed at coercing them into entering into agreements to hire Local 17 members. (See, e.g., Sup. Indict. at 11-12 (generally alleging that Defendant Larson "wrongfully" attempted to obtain the property of STS Construction, such property consisting of wages and benefits to be paid under labor contracts with Local 17, along with the STS employees' wages and benefits, "by compelling and inducing and attempting to compel and induce STS and its owner

---

[8] The *dicta* in Enmons cited above does not compel a different conclusion. The Enmons Court interpreted New York case law to exempt from extortion liability "militant" union activity "to obtain higher wages" or for other "legitimate labor goals." 410 U.S. at 406 n.16. The Court did not, however, explain how New York law defined the parameters of these terms.

28

Timothy P. Such . . . to deliver said property . . . by means of instilling . . . a fear that if the property was not so delivered, the defendant and others would cause physical injury to some person in the future and cause damage to the property[.]"); 37 (allegation that Defendant Larson told an STS Construction representative: "You should sign. Russo's [e]quipment was damaged . . . If you had signed, these things wouldn't happen to you."); 37-38 (allegation that an STS representative, approached by Defendant Larson to sign a CBA, asked: "What are the positives? You guys slash my tires, stab me in the neck, try to beat me up in a bar. What are the positives to signing? There are only negatives." To this Defendant Larson responded: "The positives are that the negatives you are complaining about would go away.").)

## B. Defendant Bove's Motion to Dismiss

Judge Scott concluded that Defendant Bove's separate motion to dismiss the indictment should be granted. Judge Scott found that Defendant Bove's first argument – that the indictment was invalid because it did not make sufficient factual allegations against him – lacked merit. However, Judge Scott agreed that the indictment as to Defendant Bove criminalized protected speech. Judge Scott identified the relevant question as whether Defendant Bove's speech was "integral to criminal conduct." Because, in Judge Scott's view, the indictment failed to allege criminal conduct (*i.e.*, Hobbs Act or state law extortion), he determined that the speech was not integral to any crime.

Given his recommendation that the indictment be dismissed on Enmons and First Amendment grounds, Judge Scott found it unnecessary to decide whether the Hobbs Act unconstitutionally failed to warn of the potential for criminal liability for the conduct at issue.

## 1. Facial Sufficiency of the Indictment as to Defendant Bove

Defendant Bove does not argue that the indictment fails to recite the elements of the crimes charged. Rather, Defendant Bove contends that there are very few specific described acts that support his indictment, "beyond the mere membership in the union." (Mem. in Supp. of Def. Bove's Mot. Dismiss at 2.)

As noted, an indictment is constitutionally sufficient if it charges a crime with enough precision to inform the defendant of the charges against him and provides enough detail that the defendant might plead double jeopardy in a future prosecution based on the same conduct. United States v. Stavroulakis, 952 F.2d 686, 693 (2d Cir. 1992). "An indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" Id. (quoting United States v. Tramunti, 513 F.2d 1087, 1113 (2d Cir. 1975), and citing cases).

This Court agrees with Judge Scott that the indictment is sufficient with respect to its allegations against Defendant Bove. Defendant Bove is named as a Local 17 member who "occupied positions of influence within the Local 17 Criminal Enterprise." (Sup. Indict. at 4.) He is part of the alleged "group" that was willing to engage in acts of violence and destruction of property against Western New York construction employers. (Id.) He is named in two of the alleged acts of racketeering constituting the charged pattern of racketeering. (Id. at 15-17 (Racketeering Act 3); and 24-25 (Racketeering Act 7).) The racketeering act allegations include the approximate dates; the names of the victim companies; the relevant places; and the specific property sought. Defendant Bove also is named in several of the "overt acts" that are described in support of the Hobbs Act conspiracy count. (See, e.g., id. at 34-35, 39-40, 41.) This is sufficient to satisfy the

30

pleading requirements set forth above.  See United States v. Cohen, 518 F.2d 727, 733 (2d Cir. 1975) ("The Government need not, when charging conspiracy, set out with precision each and every act committed by the conspirators in the furtherance of the conspiracy."); United States v. Bronson, 2007 WL 2455138, *3 (E.D.N.Y. Aug. 23, 2007) (finding a RICO conspiracy indictment sufficient because it alleged an enterprise, named the defendant as a person associated with the enterprise, specified the time of the conspiracy's operation, described the types of predicate crimes committed, and alleged that the defendant knowingly conspired to violate 18 U.S.C. § 1962(d).)

### 2.  Whether the Indictment Should be Dismissed under the First Amendment

Defendant Bove next argues, and Judge Scott agreed, that the indictment must be dismissed because it seeks to prosecute him for exercising his rights to free speech and association under the First Amendment.  In essence, Defendant Bove contends he is being prosecuted based only on his membership in Local 17 and on various protected statements he made in furtherance of the union's goals.

The crimes with which Defendant Bove is charged are (1) RICO conspiracy; (2) Hobbs Act conspiracy; and (3) one count of attempted Hobbs Act extortion.  (Sup. Indict. at 4, 32, 56-57.)   He also is alleged to have engaged in two predicate acts of attempted extortion that form the basis for the RICO count.  (Id. at 15-17, 24-25.)  Finally, he is alleged to have perpetrated several of the "overt acts" in furtherance of the Hobbs Act conspiracy.  The "overt acts" consist of various statements made by Defendant Bove, along with one instance of picketing.  (Id. at 34-35, 39-40, 41.)

It is indisputable that many activities by union members, including speeches, picketing, and boycotting, are forms of speech and conduct entitled to First Amendment

protection.  <u>See</u>, <u>e.g.</u>, <u>Smithfield Foods, Inc. v. United Food and Commercial Workers Int'l</u> <u>Union, et al.</u>, 585 F.Supp.2d 789, 803 (E.D.Va. 2008).  "The dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution."  <u>Thornhill v. Alabama</u>, 301 U.S. 88, 102, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).  "Free discussion concerning the conditions in industry and the causes of labor disputes appears to us indispensable to the effective and intelligent use of the processes of popular government to shape the destiny of modern industrial society."  <u>Id.</u> at 103.  This is true even though such information "may persuade some of those reached from entering into advantageous relations with the business establishment that is the scene of the dispute."  <u>Id.</u> at 104.

But the protection afforded by the First Amendment is not absolute, even in the labor context.  As an initial matter, the "First Amendment does not provide a defense to a criminal charge simply because the actor uses words to carry out his illegal purpose." <u>United States v. Barnett</u>, 667 F.2d 835, 842 (9th Cir. 1982).  "The Supreme Court repeatedly has recognized that it does not abridge the freedom of speech to make a course of conduct illegal, even though the conduct is in some respect carried out by means of expression."  <u>Smithfield Foods</u>, 585 F.Supp.2d at 803 (citing <u>Cox v. Louisiana</u>, 379 U.S. 559, 563, 85 S.Ct. 476, 13 L.Ed.2d 487 (1976)); <u>see also</u> <u>Giboney v. Empire Storage &</u> <u>Ice Co.</u>, 336 U.S. 499, 502, 69 S.Ct. 684, 93 L.Ed. 834 (1949) ("[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.").

Moreover, it is settled that "true threats" of violence are not protected by the First Amendment.  Virginia v. Black, 538 U.S. 343, 349, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003).  As the Supreme Court explained in Black,

> The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats "protect[s] individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur."  Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.

Id. at 359-50 (citing R.A.V. v. City of St. Paul, 505 U.S. 377, 388, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992)).  Additionally, it is clear that threats of extortion are not protected under the First Amendment "simply because they are verbalized or written."  United States v. Bly, 510 F.3d 453, 456 (4th Cir. 2007); see also United States v. Boyd, 231 Fed.Appx. 314, 316 (5th Cir. 2007) ("The First Amendment does not protect extortion."); Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coalition of Life, 244 F.3d 1007, 1015 n.8 (9th Cir.), reh'g en banc granted, 268 F.3d 908 (2001), reh'g en banc, 290 F.3d 1058 (2002); Smithfield Foods, 585 F.Supp.2d at 806 ("[T]he law seems quite settled that the First Amendment provides no refuge for extortion.").

A conspiracy to commit a crime or crimes typically will include association and speech.  However, even though RICO requires association with an "enterprise," the RICO conspiracy provision punishes conduct rather than mere association or speech – namely, the intentional conduct of agreeing to further the criminal enterprise by committing predicate crimes.  United States v. Yarbrough, 852 F.2d 1522, 1540-41 (9th Cir. 1988);

United States v. Rubio, 727 F.2d 786, 792 (9th Cir. 1983) (citing United States v. Martino, 648 F.2d 367, 380 (5th Cir. 1981)); United States v. Elliott, 571 F.2d 880, 903 (5th Cir. 1978) ("To be convicted as a member of an enterprise conspiracy, an individual, by his words or actions, must have objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise through the commission of two or more predicate crimes.").

In light of this background, it is premature at this time to dismiss the indictment against Defendant Bove (or any other Defendant) on First Amendment grounds, because there has been no evidence introduced to establish precisely what conduct – protected or unprotected – is at issue here. The mere inclusion of speech-related allegations in the indictment is not enough to deem the entire basis for Defendant Bove's prosecution for extortion and conspiracy facially impermissible under the First Amendment. Compare Watts v. United States, 394 U.S. 705, 706-08, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (trial judge erred in denying defendant's motion for a judgment of acquittal, *after* the government's evidence showed that the defendant's statement allegedly threatening the President of the United States was merely "political hyperbole" and not a true threat).

Of course, the evidence produced to prove the allegations against Defendant Bove may show that he engaged solely in protected speech and conduct and never crossed the line into attempted extortion and conspiracy. But this is a matter of proof that cannot be resolved at this stage of the proceedings.[9]  See Nat'l Org. for Women v. Scheidler, 510

---

[9]Defendant Bove asserts that the *strictissimi juris* standard of review should apply to this Court's evaluation of the indictment in this case. The *strictissimi juris* standard of review for sufficiency of the evidence applies where an organization is shown to engage in both legal and illegal conduct, and where the organization's conduct is "within the shadow of the first amendment." United States v. Montour, 944 F.2d 1019, 1024 (2d Cir. 1991) (citing cases)). The *strictissimi juris* standard requires a reviewing court to

U.S. 249, 264, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994) ("Conduct alleged to amount to

Hobbs Act extortion . . . or one of the other, somewhat elastic RICO predicate acts may

turn out to be fully protected First Amendment activity, entitling the defendant to dismissal

on that basis.") (Souter, J., concurring).

>As the Second Circuit has explained,

> Numerous crimes under the federal criminal code are, or can
> be, committed by speech alone. . . . Notwithstanding that
> political speech and religious exercise are among the activities
> most jealously guarded by the First Amendment, one is not
> immunized from prosecution for such speech-based offenses
> merely because one commits them through the medium of
> political speech or religious preaching.  Of course, courts must
> be vigilant to insure that prosecutions are not improperly based
> on the mere expression of unpopular ideas.   But if the
> evidence shows that the speeches crossed the line into
> criminal solicitation, procurement of criminal activity, or
> conspiracy to violate the laws, the prosecution is permissible.

United States v. Rahman, 189 F.3d 88, 117 (2d Cir. 1999) (citing United States v. Spock,

416 F.2d 165, 169-71 (1st Cir. 1969)).   Defendant Bove's motion to dismiss the indictment

on First Amendment grounds is denied.

### a.  Right to a Pre-Trial Evidentiary Hearing

Defendant Bove alternatively seeks a pre-trial evidentiary hearing on the First

Amendment issues, citing Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d

22 (1965).  In Dombrowksi, state officials raided the offices of, seized files from, and

---

satisfy itself that there is sufficient evidence of the individual defendant's own participation in and advocacy of the illegal goals of the alleged conspiracy.  Id.  The court may not impute to the defendant the illegal intent of alleged co-conspirators.  Id.

The *strictissimi juris* standard is, by its terms, relevant when a court is evaluating the sufficiency of the evidence supporting a conviction.  Id.  It does not apply to review of the validity of the indictment itself, and therefore is not applicable to determination of this motion to dismiss.

prosecuted the appellants, the leaders of a civil rights organization, under anti-Communist laws. Id. at 487-88. The appellants filed an action in federal court seeking an injunction against the state on First Amendment grounds. Id. at 482. The appellants alleged that the state's actions were part of a larger plan to use "arrests, seizures, and threats of prosecution under color of the statutes to harass appellants" and discourage them from pursuing civil rights causes in the state. Id.

A three-judge panel of the district court dismissed the appellants' complaint on the ground that the allegations, although "conceded to raise serious constitutional issues, did not present a case of threatened irreparable injury to federal rights which warranted cutting short the normal adjudication of constitutional defenses in the course of state criminal prosecutions[.]" Id. at 483.

The Supreme Court reversed. Id. at 483. The Court reasoned that waiting for state prosecution and adjudication of the constitutional challenges to the sweeping statutes at issue would create, and in fact already had created, an impermissible chilling effect on the exercise of appellants' First Amendment rights. Id. at 486-89. As such, the Court ruled that the demand for immediate injunctive relief from the federal court was justified. Id. at 489.

Dombrowski is inapposite here. Even assuming that case could be read to permit this Court to hold a pre-trial evidentiary hearing on First Amendment issues in a federal criminal prosecution, the indictment here sounds in extortion and conspiracy, not political activism. As discussed, extortion and conspiracy, even if committed through speech, are not protected under the First Amendment. Thus, the "serious constitutional issues" warranting immediate federal review in Dombrowski are not present in this case.

Defendant Bove's request for a pre-trial hearing is denied.[10]

### 3. "Fair Warning"

Finally, Defendant Bove claims the Hobbs Act is unconstitutional as applied in this case, because it did not fairly apprise him that the conduct alleged in the indictment could be subject to criminal prosecution. In other words, Defendant Bove claims to have been deprived of the due process requirement of "fair warning" of the criminality of his conduct. See United States v. Lanier, 520 U.S. 259, 266-67, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (due process requires "fair warning" of the potential criminality of conduct; "[T]he touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.").

This Court finds no merit to Defendant Bove's argument. The Hobbs Act proscribes impeding or affecting interstate commerce "by robbery or extortion." 18 U.S.C. § 1951. "Extortion" is defined clearly as the "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear[.]" Id. These are plain terms the average individual would understand, and they are the plain terms set forth in the indictment. See Lanier, 520 U.S. at 266-67. Further, the Enmons Court clarified the term "wrongful" in the Hobbs Act by defining the term to describe coercion where the alleged extortionist has no lawful claim to the property demanded. 410 U.S. at 400; see Lanier, 520 U.S. at 266 (noting that statutory ambiguity may be resolved "by judicial gloss

---

[10]Nor is there any merit to Defendant Bove's contention that he has a "right not to be tried" on the charges against him. Once a facially valid indictment has been handed down, that is enough to call for a trial on the merits of the charges. United States v. Mills, 995 F.2d 480, 487 (4th Cir. 1993). The "right not to be tried" can be invoked only where the indictment is so deficient that it causes "the indictment no longer to be an indictment." Midland Asphalt Corp. v. United States, 489 U.S. 794, 802, 109 S.Ct. 1494, 103 L.Ed.2d 879 (1989).

on an otherwise uncertain statute").[11]

Moreover, the fact that the judicially-created labor exception in <u>Enmons</u> overlays the analysis in this case does not mean Defendant Bove was deprived of fair warning that the conduct alleged in the indictment – *i.e.*, harassment of employers, often violent and destructive, to obtain collective bargaining agreements – was "wrongful" within the meaning of the Hobbs Act. "[T]he strong presumptive validity that attaches to an Act of Congress has led [the Supreme Court] to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." <u>United States v. Nat'l Dairy Products Corp.</u>, 372 U.S. 29, 32, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963) (citing <u>Jordan v. De George</u>, 341 U.S. 223, 231, 71 S.Ct. 703, 85 L.Ed. 886 (1951), and <u>United States v. Petrillo</u>, 332 U.S. 1, 7, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947)).

---

[11]The Hobbs Act has withstood multiple vagueness challenges. <u>See</u> <u>United States v. Rodriguez</u>, 360 F.3d 949, 954 (9th Cir. 2004) (rejecting vagueness challenge to Hobbs Act's definition of "commerce"); <u>United States v. Taylor</u>, 966 F.2d 830, 836 (4th Cir. 1992) (Hobbs Act's application to state legislators was not unconstitutionally vague); <u>United States v. Tropiano</u>, 418 F.2d 1069, 1082-83 (2d Cir. 1969) (rejecting vagueness challenge to charge of attempted Hobbs Act extortion); <u>United States v. Williams</u>, 621 F.2d 123, 125 (5th Cir. 1980) (rejecting vagueness challenge to extortion "under color of official right" and citing cases rejecting general constitutional challenges to the Hobbs Act).

## IV.  CONCLUSION

For the foregoing reasons, this Court finds that the Magistrate Judge's Report and Recommendation must be set aside.  Additionally, this Court finds that Defendants' Joint Motion to Dismiss and Defendant Bove's Motion to Dismiss must be denied.

## V.  ORDERS

IT HEREBY IS ORDERED, that the Report and Recommendation of the Honorable Hugh B. Scott (Docket No. 184) is SET ASIDE.

FURTHER, that the Defendants' Joint Motion to Dismiss (Docket No. 153) is DENIED.

FURTHER, that Defendant Bove's Motion to Dismiss (Docket No. 155) is DENIED.

FURTHER, that this case will be returned to Judge Scott for further pre-trial proceedings.

SO ORDERED.

Dated:         August 10, 2011
               Buffalo, New York

                                        /s/William M. Skretny
                                        WILLIAM M. SKRETNY
                                        Chief Judge
                                        United States District Court